*1*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

OCT 0 4 2000

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **VS.** | ) | **CRIMINAL NO. B-97-CR-20** |
| | ) | |
| **JAVIER LOPEZ CANTU** | ) | **B-00-154** |

| | |
|---|---|
| Name of Movant: | Javier Lopez Cantu |
| Prisoner No.: | 74613-079 |
| Place of Confinement: | U.S.P. Beaumont, Beaumont, Texas 77720-6040 |

## MOTION UNDER 28 USC § 2255 TO VACATE, SET ASIDE,
## OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY

NOW COMES JAVIER LOPEZ CANTU, Movant, by and through his attorney of record, Chris Flood, and files this motion under 28 USC § 2255 to vacate, set aside, or correct his sentence, as follows:

1. The District Court for the Southern District of Texas, Brownsville Division, entered the judgment of conviction under attack.

2. The date of the judgment of conviction was August 1, 1997. (**Exhibit 1** attached)

3. The length of the sentence was 360 months on Count 1 and 20 years on Count 2, to be served concurrently.

4. The nature of the offense involved was conspiracy to possess, with intent to distribute, a quantity exceeding 1000 kilograms of marijuana, and conspiracy to launder money instruments.

5. Movant's plea was Not Guilty.

6. Movant had a jury trial.

7. Movant did not testify at the trial.

ChkPDF - www.fxsio.com

8.      Movant's appeal was filed in the Fifth Circuit Court of Appeals under Cause No. 97-40930, and the conviction was affirmed on February 3, 1999.

9.      Movant previously filed his Application for Writ of Certiorari, which was denied on October 4, 1999, by the Supreme Court.

11.     There have been no other proceedings or hearings with respect to the judgment in any federal court.

12.     The grounds on which this claim is made are:

    A.   **Ground One:**

         Movant's sentence in Count 1 to 360 months violates the Supreme Court's decision in *Apprendi v. New Jersey*, 120 S.Ct. 2348 (2000), and the Fifth Circuit's decision in *United States v. Meschack*, #99-50669 (Aug. 28, 2000) by denying Movant his right to have the jury determine beyond a reasonable doubt that Movant entered into a conspiracy to possess with intent to distribute 1,000 kilograms or more of marijuana.

Attached hereto as **Exhibit 2** is a copy of the indictment including Counts 1 and 9, the Counts of conviction. Counts 2 through 8, hereinafter referred to as the "substantive counts" were either dismissed by the Court at the conclusion of the Government's case or were not proven beyond a reasonable doubt, as evidenced by the jury's finding of not guilty as to those counts. At the time the Court originally charged the jury as to the elements of Count 1, the Court failed to require the jury to find Movant guilty only if the Government proved a conspiracy to possess with intent to distribute 1,000 kilograms or more of marijuana. In fact, the jury's decision to find the Movant not guilty of the substantive counts clearly indicates that the jury did not believe that Movant's relevant conduct included 1,000 kilograms or more of marijuana. Attached as **Exhibits 3, 4 and 5** are the relevant excerpts from the record reflecting that the Court failed to require the

-2-

jury to make a finding that the Government prove the essential element of 1,000 kilograms of marijuana alleged in Count 1 of the indictment.

A review of Exhibits 3, 4 and 5 reflects that at sentencing the Court determined the amount of drugs for which Movant was responsible, taking into consideration the substantive counts of which Movant was acquitted. Since the jury did not determine the amount by proof beyond a reasonable doubt – rather, the Court did by a preponderance of the evidence – the judgment violates the Supreme Court's decisions in *Apprendi v. New Jersey, supra*, and *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). The Fifth Circuit followed the Supreme Court's decision in *Apprendi* and *Jones* in *United States v. Meschack, supra*. The trial court's failure to require proof beyond a reasonable doubt as to the 1,000 kilograms or more of marijuana renders Movant's judgment invalid and Movant respectfully requests that this Court vacate the judgment and sentence.

In the alternative, Movant's judgment and sentence should be vacated and Movant should be sentenced to the least amount of marijuana included in Title 18, § 841. Title 21, § 841(b)(D) states in pertinent part:

> "In the case of less than 50 kilograms of marijuana, except in the case of 50 or more marijuana plants, regardless of weight . . . such person shall be sentenced to a term of imprisonment of not more than five years, a fine not to exceed the greater of that authorized in accordance with the provisions of Title 18, or $250,000 if the defendant is an individual. . . ."

The trial court's failure to require proof beyond a reasonable doubt as to the allegation of 1,000 kilograms or more in accordance with *Apprendi*, *supra*, and *Meschack*, *supra*, renders Movant's judgment invalid and Movant should be resentenced to a maximum term of imprisonment of five (5) years.

-3-

B.   **Ground Two:**

> Movant's conviction should be set aside for a violation of
> the Due Process Clause of the United States Constitution,
> due to the trial court's failure to properly require the
> Government to prove Movant's guilt beyond a reasonable
> doubt.

Attached as a portion of **Exhibit 3** is page 1312. Lines 2-7 of that page illustrate how the

trial court improperly charged the jury as to the proper burden of proof under the Due Process

Clause of the United States Constitution. The Supreme Court in *United States v. Gaudin*, 515

U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995), and earlier in *Sullivan v. Louisiana*,

508 U.S. 275, 278, 113 S.Ct. 2070, 124 L.Ed.2d 182 (1993), found that the Due Process Clause

entitles a defendant to a jury determination that he is guilty of every element of the charged crime.

In this case, Movant was denied his right to due process that the Government prove its case

beyond a reasonable doubt. Taking into consideration the jury's note no. 1, which called into

question whether the Government had to prove Movant's involvement in the conspiracy beyond

a reasonable doubt, and then the jury's later decision to acquit Movant on all substantive counts,

this Court's error in failing to properly instruct the jury was emphasized.

C.   **Ground Three:**

> Movant's right to due process under the Fifth Amendment
> to the United States Constitution was violated when the
> Government forced Movant to stand trial on an indictment
> which the Government knew was based partially on perjured
> testimony.

Attached as **Exhibit 6** is an affidavit of Roy Edward Cantu, Movant's brother, who

testified on January 8, 1997 before a grand jury which indicted Movant. As evidenced by a

reading of the affidavit, at the time Roy Cantu testified the Government had reason to believe that

his testimony was not true and was being said in an effort to avoid being charged along with his

-4-

brother, as threatened by the Government. It is also evident from the attached affidavit that not only when the testimony was at first elicited before the grand jury did the Government have reason to believe it was untrue, but also later when Roy Cantu refused to testify as a witness for the Government based on the representations that he had lied before the grand jury. In such an event the Government had an obligation to immediately inform the Court and opposing counsel.

The Supreme Court in *Mooney v. Holohan*, 294 U.S. 103, 54 S.Ct. 340, 79 L.Ed. 791 (1935); *Giles v. Maryland*, 386 U.S. 66, 87 S.Ct. 793, 17 L.Ed.2d 737 (1967); *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), has repeatedly held that the prosecution's use of known false testimony at trial requires a reversal of an individual's conviction. The Ninth Circuit in *United States v. Basurto*, 497 F.2d 781, 786 went one step further when it held:

> "The court held in *Napue* that the prosecution's use of known false testimony at trial required a reversal of petitioner's conviction. The same result must obtain when the government allows a defendant to stand trial on an indictment in which it knows to be based in part upon perjured testimony. The consequences to the defendant of perjured testimony given before the grand jury are no less severe than those of perjured testimony given at trial, and in fact may be more severe. The defendant has no effective means of cross-examining or rebutting perjured testimony given before the grand jury, as he might in court." *Basurto*, *supra*, at 786.

The Fifth Amendment provides that "no person shall be held to answer for a capital or otherwise infamous crime, unless on the presentment of the indictment of a Grand Jury." U.S. Const. Amend. 5. It is also clear that when a duly constituted grand jury returns an indictment, no independent inquiry can be made to determine the kind of evidence considered by the grand jury making its decision. *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 106 L.Ed. 397 (1956).

Therefore, since Movant had no vehicle to challenge the determination of the grand jury as to probable cause, Movant's only opportunity to challenge the validity of the indictment was through this post-conviction motion under 28 U.S.C. § 2255.

D.   **Ground Four:**

Movant's judgment and sentence should be vacated due to the impermissibly suggestive pretrial identification of Movant by Government witness Mark Miller.

Attached as **Exhibit 7** is a true and correct copy of the photo array sent to Government witness Miller along with a copy of the letter the witness sent to DPS Investigator Richard Brazzil. Exhibit 7 had been introduced at trial as Government's Exhibits 190 and 190(a). Photos numbered 2 and 5 are both pictures of Movant, thereby rendering the photo array impermissibly suggestive. In addition, when taking into consideration whether the impermissibly suggestive pretrial identification poses substantial likelihood of irreparable misidentification, it becomes necessary to review the testimony of government witness Miller.

In determining, under the totality of circumstances, whether an identification is reliable, one needs to consider the opportunity of the witness to view the alleged criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the individual, the level of certainty demonstrated by the witness at the time he viewed the photo lineup, and the length of time between the alleged crime and the photo lineup. Attached hereto as **Exhibit 8** is an excerpt of the testimony of Mark Miller pertaining to his review of the impermissibly suggestive photo array. A review of Exhibit 8 reveals that Miller had very little opportunity to see the Movant at the time of the alleged crime, that Miller's degree of attention was minimal, his accuracy of his prior description of Movant was laughable, and his entire lack of certainty, including misidentification of Movant when shown the photo array, is extreme. This Court should, in hindsight, find that Miller's in-court identification was tainted by the

-6-

impermissibly suggestive out-of-court photo array, order that Miller's testimony be stricken and Movant's conviction be vacated and set aside.

      E.    **Ground Five:**

> Movant's judgment and sentence should be vacated and set aside due to the Government's failure to produce exculpatory evidence relating to the testimony of government witness Fabian Cavazos that he worked for Movant at all times, when the attorney for the Government failed to disclose to Movant's counsel that Fabian Cavazos was arrested in 1986 with Richard Russell in Refugio, Texas, with a considerable amount of marijuana while working for another individual.

During the Government's case in chief, a crucial witness for their case, Fabian Cavazos, testified that all of his marijuana trafficking activity was done while working for Movant. Counsel for Movant has since learned that in 1986 Cavazos was arrested in Refugio, Texas, with a large amount of marijuana, along with another government witness, Richard Russell. At the time of Mr. Cavazos' arrest, he was driving a pickup truck, mustard in color, with Arkansas license plates. The significance of that arrest was that Mr. Cavazos was employed by another narcotics trafficker at the time, which would have contradicted his trial testimony. The Government's failure to inform Movant and/or Movant's counsel prior to trial of this material exculpatory evidence is a violation of the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) and its progeny, and this Court should set aside Movant's conviction and order a new trial.

    13.    None of the above grounds have been previously presented because they have not been ripe for review.

    14.    There is no petition or appeal now pending in any court as to the judgment under attack.

14.     The attorney who represented Movant at trial and on appeal was Chris Flood, of Flood & Flood, 914 Preston, Suite 800, Houston, Texas 77002, formerly with DeGuerin & Dickson, 1018 Preston, 7th Floor, Houston, Texas 77002.

16.     Movant was sentenced on two counts in the indictment in the same court at the same time.

17.     Movant does not have any future sentence to serve after he completes the sentence imposed by this judgment.

WHEREFORE, Movant prays that the Court order a hearing on his motion to vacate and set aside his judgment and sentence, and after hearing the same order that Movant's judgment be vacated and that Movant be brought back before this Court for further proceedings, if any.

Respectfully submitted,

FLOOD & FLOOD


Chris Flood
914 Preston Avenue, Suite 800
Houston, TX 77002
(713) 223-8877
(713) 223-8879 (Fax)
State Bar No. 07155700
Federal I.D. No. 9929
**Attorney for Movant**

CUtePDF - www.faxlra.com

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing **Motion Under 28 USC § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody** has been served on Jody Young, Assistant United States Attorney, by mailing same to 600 E. Harrison #201, Brownsville, Texas 78520, on October 3, 2000.


Chris Flood

# VERIFICATION

THE STATE OF TEXAS                    §
                                      §
COUNTY OF JEFFERSON                   §

     BEFORE ME, the undersigned authority, on this day personally appeared 

CANTU, who, after being by me first duly sworn, on his oath deposed and said:

     My name is Javier Lopez Cantu and I am the Movant in the foregoing motion under

28 USC § 2255. I declare under penalty of perjury that all information in the foregoing is true and

correct. Executed on September 29, 2000.

                                    _____
                                    JAVIER LOPEZ CANTU

     SUBSCRIBED AND SWORN TO before me on September 29, 2000

                                    _____
                                    Notary Public in and for The State of Texas
                                    My commission expires_____

LORRIA LEE PALMIERI
Notary Public, State of Texas
My Commission Expires
FEBRUARY 4, 2003

AO 245B (Rev. 3/95) Sheet 1 - Judgment in a Cr    Case

United States District Court
Southern District of Texas
FILED

# United States District Court

## Southern District of Texas

AUG 0 1 1997

Michael N. Milby, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | (For Offenses Committed On or After November 1, 1987) |
| **JAVIER LOPEZ CANTU** | Case Number:  1:97CR00020-001 |
| | Charles Lewis |
| | Defendant's Attorney |

## THE DEFENDANT:

— ☐ pleaded guilty to count(s) _____

— ☐ pleaded nolo contendere to count(s) _____
   ☐ which was accepted by the court.

— ☒ was found guilty on count(s)  1 and 9 on 04/26/97
   after a plea of not guilty.

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 21 U.S.C.   846 | Conspiracy to possess, w/intent to distribute, a quantity exceeding 1000 kilograms of marijuana. | 01/29/1997 | 1 |
| 18 U.S.C.   1956 (h) | Conspiracy to launder money instruments. | 01/29/1997 | 9 |

The defendant is sentenced as provided in pages 2 through __6__ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☒ The defendant has been found not guilty on count(s) 2, 3, 7 and 8

— ☐ Count(s) _____ (is)(are) dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

| | |
|---|---|
| Defendant's Soc. Sec. No.:  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 | 07/16/1997 |
| Defendant's Date of Birth:  01/17/1967 | Date of Imposition of Judgment |
| Defendant's USM No.:  74613-079 | |
| Defendant's Residence Address: | |
| 2001 East Jackson Street | Signature of Judicial Officer |
| Brownsville          TX     78520 | Honorable Filemon B. Vela |
| | United States District Judge |
| Defendant's Mailing Address: | Name & Title of Judicial Officer |
| 2001 East Jackson Street | |
| Brownsville          TX     78520 | Date  8/1/97 |

(RB by AF/erb)

TRUE COPY I CERTIFY
ATTEST:
MICHAEL N. MILBY, CLERK
By _____
Deputy Clerk

AO 245B (Rev. 3/95) Sheet 2 - Imprisonment

DEFENDANT:       JAVIER LOPEZ CANTU
CASE NUMBER:     1:97CR00020-001

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of ___360    month(s)___ .

This term consists of three hundred sixty (360) months on Count 1. Twenty (20) years on Count 9 to be served concurrently with Count 1 for an aggregate sentence of three hundred sixty (360) months.

☐  The court makes the following recommendations to the Bureau of Prisons:

☒  The defendant is remanded to the custody of the United States Marshal.

☐  The defendant shall surrender to the United States Marshal for this district:

    ☐  at _____ a.m./p.m.  on _____ .

    ☐  as notified by the United States Marshal.

☐  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐  before 2 p.m. on _____ .

    ☐  as notified by the United States Marshal.

    ☐  as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
Deputy U.S. Marshal

GJ

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

### BROWNSVILLE DIVISION

2/3/97

MICHAEL [illegible] CLERK

| UNITED STATES OF AMERICA | § | |
| | § | |
| vs. | § | CRIMINAL NO. *B- 97-20* |
| | § | |
| JAVIER LOPEZ CANTU | § | |

## INDICTMENT

THE GRAND JURY CHARGES:

### COUNT 1

That from in or about 1985 up to the return of this indictment in the Southern District of Texas and elsewhere and in the jurisdiction of this court, Defendant

JAVIER LOPEZ CANTU

did knowingly and intentionally combine, conspire, confederate and agree together with others, known and unknown to the grand jury, to possess with intent to distribute 1000 kilograms or more of marihuana, a Schedule I controlled substance.

Pursuant to this conspiracy the following overt acts, among others, were committed in the Southern District of Texas, and elsewhere.

OVERT ACTS

1. On March 29, 1985 JAVIER LOPEZ CANTU delivered a box containing approximately 2.2 kilos of marihuana to Emory Express at Brownsville, Texas.

1

429

CSMPDF - www.fscico.com

Case 1:00-cv-00154   Document 1   Filed in TXSD on 10/04/2000   Page 14 of 121

Δ's cousin jail
in Beaumont
can't don't remember

2. On January 19, 1986 JAVIER LOPEZ CANTU, Roy Cantu and Richard Russell delivered approximately 18 kilos of marihuana to the Harlingen Airport in Harlingen, Texas.

3. On April 22, 1986, JAVIER LOPEZ CANTU possessed a small quantity of marihuana in McAllen, Texas.

4. On December 3, 1986 JAVIER LOPEZ CANTU caused the transportation by Fabian Cavazos and Russell Blackwell of approximately 11 kilograms of marihuana from Cameron County, Texas to the area of Saint Martin Parish, Louisiana.

5. On December 16, 1987 JAVIER LOPEZ CANTU and Fabian Cavazos transported from Cameron County, Texas to Panola County, Texas approximately 5.7 kilograms of marihuana.

6. In or about August, 1989 JAVIER CANTU supplied one or more persons to assist in the loading of approximately 698 pounds of marihuana. This load was then transported to a Border Patrol Checkpoint in the Southern District of Texas.

7. On May 22,1990, JAVIER LOPEZ CANTU caused the transportation of approximately 261 kilograms of marihuana by Arnulfo Telles, Javier Vela and Roy Cantu from Cameron County, Texas to the Sarita, Texas Border Patrol checkpoint.

8. On November 22, 1990, JAVIER LOPEZ CANTU caused the transportation of approximately 135 kilograms of marihuana by Samuel Anorga from Cameron County, Texas to the Sarita, Texas Border Patrol Checkpoint.

9. On January 25, 1991, Roy Cantu, Fabian Cavazos, Julio Gallardo and Jose Galvan possessed approximately 68 kilograms of

marihuana and $47,890 in U.S. currency in Houston, Texas. Prior to this JAVIER LOPEZ CANTU had caused the transportation of this marihuana from Cameron County, Texas to Houston, Texas.

10. On April 16, 1993, JAVIER LOPEZ CANTU caused the delivery of approximately 293 kilograms of marihuana to the UPS facility in Brownsville, Texas.

11. In approximately October of 1994 JAVIER LOPEZ CANTU supplied approximately 18 kilos of marihuana that was secreted in a dog kennel in the back of a pick-up truck in the area of Houston, Texas.

12. In April, 1995, JAVIER LOPEZ CANTU caused the transportation of approximately 90 kilos of marihuana from Cameron County, Texas to Houston, Texas. This marihuana was stored in Houston, Texas. Mark Miller on April 25, 1995 picked up this marihuana in Houston for transportation out of state. Later that same day Fabian Cavazos and Roy Cantu tried to transfer this marihuana from one vehicle to another.

13. On January 28, 1997 JAVIER LOPEZ CANTU possessed in excess of $3,000 in U.S. currency and a small amount of marihuana.

14. JAVIER LOPEZ CANTU and other co-conspirators used money from the sale of marihuana to acquire and/or maintain the following assets, among others:

        a. 3916 Manitou, Houston, Texas

        b. 4705 Young, Brownsville, Texas

        c. 185 Palo Alto, Brownsville, Texas

3

d. Island Hotel Company, L.C. This entity in turn owns the Island Hotel, 4000 Laguna, South Padre Island, Texas, and lots 9, 10, 11, and 12, Padre Beach, Section 8.

e. A residence and land located a mile and a quarter north of the intersection of US 281 and FM 1577 on FM 1577 in Cameron County, Texas.

f. 170 Fruitdale, Brownsville, Texas.

g. Condominiums located at 238-1 and 238-2, La Isla Lane, Valley Inn and Country Club, Brownsville, Texas.

h. 3565 East 27th, Brownsville, Texas

i. 1985 Diamante, Brownsville, Texas

j. 3234 Elsa, Brownsville, Texas

k. 5574 San Mateo, Brownsville, Texas

l. a 1992 245 Celebrity boat serial number CLC13511D292 with engine, serial number 0D822078

m. Surfside Condominium Unit #108, located on South Padre Island, Texas

n. 104 East Haas, South Padre Island

o. 124 Camino Del Rey, Brownsville, Texas

p. FX club on 117 W. Jackson Street in Harlingen, Texas

q. Down South Entertainment, Inc.

r. An interest in Monchem S.A. de C.V., a chemical business located in the nation of Mexico.

s. A quantity of jewelry located on January 28, 1997

4

CMPDF - www.tavisa.com

in the residence noted in "e" above, to include
approximately 30 gold rings, men's bracelets and
watches.

w. Pedro Chevy, Inc., a Texas Corporation

x. Pesos Comida Fresh-Mex Restaurant, South Padre
   Island, Texas

y. Rack'em billiard parlor, 115 East Harrison Street,
   Harlingen, Texas

z. Travexco, Inc., a Texas Corporation


In violation of Title 21, United States Code, Sections 846
and 841(b)(1)(A).

### COUNT 2

That on our about April 16, 1993, in the Southern District
of Texas and in the jurisdiction of this Court, Defendant

### JAVIER LOPEZ CANTU

did knowingly, intentionally and unlawfully possess with intent
to distribute 100 kilograms or more of marihuana, that is 293
kilograms, a Schedule I controlled substance, in violation of 21
U.S.C. 841(a)(1), 841(b)(1)(B) and 18 U.S.C. 2.

### COUNT 3

That on or about April 26, 1995, in the Southern District of
Texas and in the jurisdiction of this Court, Defendant

### JAVIER LOPEZ CANTU

did knowingly, intentionally and unlawfully possess with intent

5

433

to distribute 50 kilograms or more of marihuana, that being 90

kilograms, a Schedule I controlled substance, in violation of 21

U.S.C. 841(a)(1), 841(b)(1)(C) and 18 U.S.C. 2.

### COUNT 4

That in the Fall of 1992, in the Southern District of Texas

and in the jurisdiction of this Court, Defendant

### JAVIER LOPEZ CANTU

did knowingly, intentionally and unlawfully possess with intent

to distribute 100 kilograms or more of marihuana, that is

approximately 136 kilograms, a Schedule I controlled substance,

in violation of 21 U.S.C. 841(a)(1), 841(b)(1)(B) and 18 U.S.C.

2.

### COUNT 5

That in or about December of 1994, in the Southern District

of Texas and in the jurisdiction of this Court, Defendant

### JAVIER LOPEZ CANTU

did knowingly, intentionally and unlawfully possess with intent

to distribute 100 kilograms or more of marihuana, a Schedule I

controlled substance, in violation of 21 U.S.C. 841(a)(1),

841(b)(1)(B) and 18 U.S.C. 2.

### COUNT 6

That in or about December, 1994, in the Southern District of

Texas and in the jurisdiction of this Court, Defendant

### JAVIER LOPEZ CANTU

did knowingly, intentionally and unlawfully possess with intent

6

to distribute 100 kilograms or more of marihuana, a Schedule I
controlled substance, in violation of 21 U.S.C. 841(a)(1),
841(b)(1)(B) and 18 U.S.C. 2.

### COUNT 7

That in or about December of 1994, in the Southern District
of Texas and in the jurisdiction of this Court, Defendant

### JAVIER LOPEZ CANTU

did knowingly, intentionally and unlawfully possess with intent
to distribute 100 kilograms of more  of marihuana, a Schedule I
controlled substance, in violation of 21 U.S.C. 841(a)(1),
841(b)(1)(B) and 18 U.S.C. 2.

### COUNT 8

That in about October, 1994, in the Southern District of
Texas and in the jurisdiction of this Court, Defendant

### JAVIER LOPEZ CANTU

did knowingly, intentionally and unlawfully possess with intent
to distribute approximately 18 kilograms of marihuana,  a
Schedule I controlled substance, in violation of 21 U.S.C.
841(a)(1), 841(b)(1)(D) and 18 U.S.C. 2

### COUNT 9

That from in or about the year of 1988 until the return of
this indictment, in the Southern District of Texas and elsewhere,
and in the jurisdiction of this court Defendant

### JAVIER LOPEZ CANTU

did combine, conspire, confederate and agree together with

7

CUtePDF - www.Kesta.com

others known and unknown to the grand jury to violate the
provisions of Title 18, United States Code, Section 1956, the
money laundering statute, that is to conduct financial
transactions, which affected interstate and foreign commerce,
with proceeds of unlawful activity, which proceeds in fact were
from specified unlawful activity,   knowing that the property
involved in the financial transactions represented the proceeds
of some form of unlawful activity, and knowing that the
transaction was designed in whole or in part to conceal and
disguise the nature, location, source, ownership and control of
the proceeds of specified unlawful activity in violation of Title
18, United States Code, Section 1956(a)(1)(B)(i) and knowing that
the transaction was designed in whole or part to promote the
carrying on of specified unlawful activity in violation of Title
18, United States Code, Section 1956(a)(1)(A)(i).

Pursuant to the conspiracy, and to effectuate the objects
thereof, the following and other overt acts were committed in the
Southern District of Texas and elsewhere:

OVERT ACTS

1. During the course of this conspiracy JAVIER LOPEZ CANTU
acquired interests in, or maintained, numerous parcels of real
estate, business entities and other assets using drug money.
Title to such acquisitions was frequently held in other names.
Such acquired real estate, entities, and assets included, but was
not limited to, the following:

a. 3916 Manitou, Houston, Texas

8

CVISPDF - www.texis.com

b. 4705 Young, Brownsville, Texas

c. 185 Palo Alto, Brownsville, Texas

d. Island Hotel Company, L.C. This entity in turn owns
   the Island Hotel, 4000 Laguna, South Padre Island,
   Texas, and lots 9, 10, 11, and 12, Padre Beach,
   Section 8.

e. A residence and land located a mile and a quarter\
   north of the intersection of US 281 and FM 1577 on
   FM 1577 in Cameron County, Texas.

f. 170 Fruitdale, Brownsville, Texas.

g. Condominiums located at 238-1 and 238-2, La Isla
   Lane, Valley Inn and Country Club, Brownsville,
   Texas.

h. 3565 East 27th, Brownsville, Texas

i. 1985 Diamante, Brownsville, Texas

j. 3234 Elsa, Brownsville, Texas

k. 5574 San Mateo, Brownsville, Texas

l. a 1992 245 Celebrity boat serial number CLC13511D292
   with engine, serial number 0D822078

m. Surfside Condominium Unit #108, located on South
   Padre Island, Texas

n. 104 East Haas, South Padre Island

o. 124 Camino Del Rey, Brownsville, Texas

p. FX club, 117 W. Jackson, Harlingen, Texas

q. Down South Entertainment, Inc.

r. An interest in Monchem S.A. de C.V., a chemical

9

437

business located in the nation of Mexico

w. Pedro Chevy, Inc., a Texas corporation

x. Pesos, 4001 Padre Island Blvd., South Padre Island, Texas.

y. Rack'em, a billiard parlor in Harlingen, Texas

z. Travexco, Inc., a Texas Corporation

2. During the course of this conspiracy JAVIER LOPEZ CANTU transferred large quantities of drug currency to other persons for purposes of investments. These quantities included sums of approximately $75,000, $125,000 and $500,000.

3. In approximately June of 1992 Island Hotel Company, L.C. was created as a Texas domestic limited liability company. Beginning in July, 1992 Island Hotel Company, L.C. began purchasing land on South Padre Island, Cameron County, Texas. Funds provided by JAVIER LOPEZ CANTU were used for such purchases.

4. On or about January 25, 1991 in Houston, Texas Roy Cantu and Fabian Cavazos possessed approximately $47,890 in U.S. currency hidden in a  Pontiac Trans Am bearing Texas plate 411 UGT.

5. In or about May, 1992 JAVIER LOPEZ CANTU  acquired a 245 Celebrity boat with Mercruiser engine from Lake Hamilton Island Marina, Hot Springs, Arkansas, and thereafter caused said craft to be transported to Cameron County, Texas. The invoice for the purchase of this  craft placed in the name  of "Francisco J.

10

438

Venegas-Alcalar." As per the invoice, the craft cost $36,600.

6. In the approximate time period of the Fall of 1992 JAVIER
LOPEZ CANTU began transferring currency to a person in Houston,
Texas for the purchase of 3916 Manitou. The total amount of funds
transferred by JAVIER LOPEZ CANTU was approximately $53,000.

7. On or about April 26, 1995 JAVIER LOPEZ CANTU transferred
to two persons a total of approximately $15,600 in U.S. currency
in Brownsville, Texas.

In violation of Title 18, United States Code, Section 1956
(h).

## NOTICE OF FORFEITURE

Pursuant to Title 21, United States Code, Section 853, the
United States gives notice that the interests of  the defendant
charged in this indictment in the following assets as set out
below are subject to forfeiture for the reasons specified in
Title 21, United States Code, Sections 853(a)(1), and (2).

1. Currency in the amount of no less than $5,000,000.

2. Real estate and business entities, as follows:

 a. 3916 Manitou, Houston, Texas

 The legal description is as follows:

 Lot 103 and the South 105 feet of the West 140 feet
 of Lot 104, in Block 2, of O.S.T. Acres, Second
 Edition, a subdivision of Harris County, Texas.

 b. n/a

 c. 185 Palo Alto, Brownsville, Texas.

 The legal description is as follows:

11

Lot #38, and the adjoining or northwest ½ of
Lot #39, Palo Verde Re-Subdivision, Section 1
an addition to the City of Brownsville,
as shown in Volume 2431 Page 326 - of the
Official Records of Cameron County, Texas

d. Island Hotel Company, L.C. This entity in turn owns
the Island Hotel, 4000 Laguna, South Padre Island,
Texas, and lots 9, 10, 11, and 12, Padre Beach,
Section 8.

The legal descriptions are as follows:

Lot 12 Block 111 Padre Beach Section VIII
a subdivision in Cameron County as shown
in Vol. 2044 Page 253 of the Official Records
of Cameron County, Texas.


Lot 9 Block 111 Padre Beach Section VIII
a subdivision in the town of South Padre
Island, Cameron County as shown in Vol.
2304 Page 162 of the Official Records
of  Cameron County, Texas.

Lots 10 and 11 Padre Beach Section VIII
a subdivision in the town of South Padre Island
in Cameron County as shown in Vol. 2304
Page 169 of the Official Records of
Cameron County, Texas.


e. A residence and land located a mile and a quarter
north of the intersection of US 281 and FM 1577 on
FM 1577 in Cameron County, Texas.

The legal description is as follows:

Lot 45, 1577 Subdivision #1 as recorded
in Vol. 9, Page 3, Map Records of Cameron
County, Texas, consisting of 5.546 acres.

12

440

f. 170 Fruitdale, Brownsville, Texas.

The legal description is as follows:

1.71 acres out of Blocks 77 and 79,
El Jardin Resubdivision, Share 19
and 27, Espiritu Santo Grant, Cameron
County, Texas.

g. Condominiums located at 238-1 and 238-2, La Isla
Lane, Valley Inn and Country Club, Brownsville,
Texas.

The legal descriptions are as follows:

Condominium Apt. 238-1, Building "C",
located on Lot 238, Country Club Estates,
Brownsville, Cameron County, Texas, of
the Valley Inn and Country Club Condominium
#1 as shown in Vol. 215 Page 429 of the
Official Records of Cameron County, Texas.

Condominium Apt. 238-2, Building "C",
located on Lot 238, Country Club Estates,
Brownsville, Cameron County, Texas, of
the Valley Inn and Country Club Condominium
#1 as shown in Vol. 165 Page 599
of the Official Records of Cameron
County, Texas.

h. 3565 East 27th, Brownsville, Texas

The legal description is as follows:

Lot 44 Blk 50, East Brownsville
Addition, 6th Section to the City
of Brownsville, Cameron County,
Texas as shown in Vol 3291 Page 24
of the Official Records of Cameron
County, Texas.

13

Case 1:00-cv-00154   Document 1   Filed in TXSD on 10/04/2000   Page 26 of 121

*[handwritten left margin: has no interest]*

i. 1985 Diamante, Brownsville, Texas

The legal description is as follows:

Lot 11 Blk 3 Valle De Oro Subdivision,
in Cameron County, Texas as shown in
Vol. 1632 Page 117 of the Official Records
of Cameron County, Texas.

*[handwritten left margin: Frank Coiture]*

j. 3234 Elsa, Brownsville, Texas — *not in Δ's name; does not belong to Δ*

The legal description is as follows:

Lot 6 Block 4, Section 1, Southmost
Subdivision, Cameron County, Texas
as shown in Vol 3223 Page 224 of the Official
Records of Cameron County, Texas.

k. 5574 San Mateo, Brownsville, Texas — *has no interest*

The legal description is as follows:

Lot 13, Minnesota Estates, Unit 3,
a subdivision in Cameron County,
Texas as shown in Vol.447 Page 159
of the Official Records of Cameron
County, Texas.

m. Surfside Condominium Unit #108, located on South
Padre Island, Texas — *does not own*

The legal description is as follows: *[handwritten: Evan Snell testified never sold the Condo to Δ,]*

Apartment 108-c, Bldg. C, Surfside I
Condominiums, a condominium regime
In the city of South Padre Island,
Texas according to Vol 789 Page 84,
Official Records of Cameron County,
Texas.

n. 104 East Haas, South Padre Island, Texas
*[handwritten: — does not own — Tony Sepulveda does]*

14

The legal description is as follows:

Lot 11, Block 4, Haas Subdivision,
of the north 16.69 acres of the south
49.49 acres out of a 100 acre tract
on Padre Island, Cameron County, Texas.

o. 124 Camino Del Rey, Brownsville, Texas

The legal description is as follows:

Lot 7, Block 5, Loma Del Rey Resubdivision
Brownsville, Texas, according to Official
Records, Vol. 2391, Page 146, Cameron
County, Texas.

p. FX club,  Harlingen, Texas

q. Down South Entertainment, Inc.

r. An interest in Monchem S.A. de C.V., a chemical
   business located in the nation of Mexico.

s. A quantity of jewelry located on January 28, 1997
   in the residence noted in "e" above to include
   approximately 30 gold rings, men's bracelets and
   watches.

w. Pedro Chevy, Inc., a Texas Corporation

x. Pesos, 4001 Padre Island Blvd., South Padre Island,
   Texas.

y. Rack'em, a billiard parlor located at 117 West
   Jackson in Harlingen, Texas

z. Travexco, Inc., a Texas Corporation

All real estate includes structures, improvements, and

fixtures.

If any of the assets described above, as a result of any act

15

443

Case 1:00-cv-00154  Document 1  Filed in TXSD on 10/04/2000  Page 28 of 121

or omission of the defendant whose interest is noted in the assets,

a) can not be located upon the exercise of due diligence;

b) has been transferred or sold to, or deposited with, a third party;

c) has been placed beyond the jurisdiction of the court;

d) has been substantially diminished in value;

e) has been commingled with other property which cannot be divided without difficulty,

then pursuant to Title 21, United States Code, Section 853(p), the United States will seek for the court to order the forfeiture of any other property of the defendant up to the value of any property described in paragraphs a) through e) above.

A TRUE BILL:

_Michael E. Funk_

FOREMAN OF THE GRAND JURY

GAYNELLE GRIFFIN JONES
UNITED STATES ATTORNEY

_Charles Lewis_

CHARLES E. LEWIS
Assistant United States Attorney

16

1    MR. FLOOD:  No, Your Honor.

2    THE COURT:  Very well.

3

4    [JURY PRESENT]

5

6    THE COURT:  The jury may be seated.

7    Everybody may be seated.

8    Ladies and gentlemen of the jury, you heard all the

9    evidence in the case.   Remember when we started this case I

10   told you that you decide the case from the evidence that was

11   presented during the course of the trial.   What came from

12   that witness stand there as well as the numerous exhibits.

13   It now becomes incumbent upon me being the Judge of

14   the law to give you what we call the Court's charge.  You, as

15   jurors, are judges of the facts, but in determining actually

16   what happened in this case, it is your sworn duty to follow

17   the law that I am about now to define to you.

18   You have to follow all of my instructions as a

19   whole.   You have no right to give any special attention or

20   disregard any one of my instructions or to question the wisdom

21   or correctness of any rule of law that I may state to you.

22   In other words, do not substitute your own notion or

23   opinion as to what the law is or what the law ought to be.

24   That is the same promise and commitment that I made, and both

25   you and I made the same commitment as judges, which you are,

1  and that is to follow the law, whether we like it or don't

2  like it, whether we agree with it or disagree with it, and to

3  apply it regardless of the consequences.

4          Remember, it is your duty to base your verdict solely

5  upon the testimony and evidence in the case.   What came from

6  that witness stand there as well as all the exhibits that were

7  admitted during the course of the trial.

8          And it is also your duty to base your verdict and to

9  reach a verdict in this case without prejudice and without

10  sympathy, without prejudice and without sympathy.   That is a

11  promise you made to both sides and they have a right to expect

12  no less of you.

13          Remember that I told you what the attorneys presented

14  to you by way of their opening statements was not evidence.

15  I don't know whether I told you when we started this case that

16  I did not have an opinion about it.  Although we are in

17  Federal Court and in Federal Court judges can probably express

18  their opinions about matters involved in the case, certainly I

19  asked questions, it was never my intention in any way to

20  affect this case in a manner by which I would express my

21  opinion.   That's your thing, your province, so if I did

22  anything to lead you to believe that I have an opinion about

23  the case, please disregard it.

24          Any questions I may have asked, you should not give

25  it any more or less importance or significance than anybody

1  else asked.   It is your thing.   I don't want to invade what

2  is exclusively yours.

3      Now, the defendant is here because the Grand Jury has

4  returned an indictment against him.   An indictment is simply

5  a description of the changes that have been filed about him.

6  It is no evidence of guilt.

7      And the law presumes him to be innocent.   And what

8  that means is, that he is by you to be presumed innocent

9  throughout your deliberations until such time, if ever, you as

10 a juror is satisfied that he has been proven guilty beyond a

11 reasonable doubt.

12     Unless you are satisfied beyond a reasonable doubt

13 that he is guilty, that presumption of innocence alone is

14 sufficient for you to find him not guilty.

15     The law does not require the defendant to produce --

16 prove his innocence or produce any evidence at all.

17     And no inference whatsoever may be taken from the

18 fact that he did not testify.   In this case for whatever

19 reason he chose not to testify.   That's a circumstance you

20 can't use against him.

21     You cannot go into that deliberation room and start

22 asking yourself, "Why didn't he testify," because you would be

23 using that circumstance against him.   Simply put, under the

24 law he doesn't have to testify and you can't use that against

25 him.

1      The Government has the burden of proving the

2  defendant's guilt beyond a reasonable doubt.   If the

3  Government did not prove his guilt beyond a reasonable doubt,

4  you should find the defendant guilty.

5      Now, the Government's burden is a heavy burden, it is

6  a strict burden, but it is not necessary that the Government's

7  proof exclude all doubt or all reasonable doubt.   Because,

8  humanly speaking, it is probably impossible for any human

9  being to prove something to another human being beyond all

10  doubt.

11      What is required is that the Government's proof

12  exclude any reasonable doubt concerning the defendant's

13  guilt.

14      And a reasonable doubt is a real doubt.   It is a

15  real doubt based upon reason and common sense after careful

16  and impartial consideration of the evidence in the case.

17      Proof beyond a reasonable able doubt is proof of such

18  a convincing character that you would be willing to act and

19  rely upon it without hesitation in the most important of your

20  personal matters.

21      If you are satisfied that the Government has proven

22  the defendant's guilt beyond a reasonable doubt, you should

23  find him guilty.   If you are not satisfied that the

24  Government has met that burden, you should find the defendant

25  not guilty.

1       Now, while you should consider only the evidence in

2   the case, you are permitted to draw such reasonable inferences

3   from the testimony and exhibits as you feel are justified in

4   the light of common experience.   In other words, you can make

5   deductions and reach conclusions which reason and common

6   sense, reason and common sense, lead you to draw from the

7   facts which have been established by the evidence in the

8   case.

9       And you can consider two kinds of evidence.   You can

10  consider direct evidence and you can consider circumstantial

11  evidence.

12      What are we talking about?

13      Direct evidence is eyewitness testimony.   I was

14  there and I saw this and this and that.   I heard this person

15  say such a thing.

16      Circumstantial evidence is a chain of events that

17  indicate that a person did something or did not do

18  something.

19      You see, nobody ever sees the person leave their

20  fingerprints on the windowsill of the house that was

21  burglarized.   Nobody saw that person there.   The fact that

22  those fingerprints are there is what?   Circumstantial evidence

23  that somebody was there, that that person was there.

24      You decide to retire for the evening and there are no

25  pipes or anything like that in your backyard and you have a

1  back lawn and it is dry.    And you retire at 10:30 in the

2  evening and right before you go to sleep your lawn is dry.

3  You wake up at 6:30 in the morning and there are four inches

4  of water on your back lawn.    You didn't know -- you didn't

5  see what happened to get those four inches of water on your

6  back lawn, did you?   The fact that those four inches of water

7  are on your back lawn is what?   Circumstantial evidence that

8  something happened to get the four inches of water on your

9  back lawn.

10          Here is what is very important to remember.   The law

11  does not distinguish between what weight should be given

12  either to direct evidence or circumstantial evidence.   It

13  leaves it entirely to you, within your province, as fact

14  finders, as judges of the facts.

15          And I said to you, judges, fellow judges, you have to

16  consider all of the evidence.   I never told you you had to

17  believe it, did I?   I never did that, did I?

18          You see, you are the sole judges of the believability

19  and credibility to be given to the testimony of all the

20  witnesses that appeared before you.   How do you do that?   How

21  do you figure you are going to weigh and assess the testimony

22  of the person who testified before you?

23          You know what I do?   I always invite my jurors to

24  consider every human experience that they've ever had in their

25  lifetime.

1     Here are some things you should definitely consider.

2   In weighing the testimony of a witness that appeared before

3   you, you should consider the relationship that the witness had

4   to either the Government or the defendant; whether the witness

5   had an interest in the outcome of the case; the manner in

6   which that witness testified; the opportunity that that

7   witness had to observe or acquire knowledge about the facts to

8   which he or she may have testified.    You consider

9   everything:   the witness' candor, frankness, fairness,

10  intelligence and the extent to which that testimony has either

11  been supported or contradicted by other believable evidence.

12       You may, in short, accept or reject in whole or in

13  part the testimony of any witness.    You can believe all of

14  what a witness said, half of what a witness said or nothing of

15  what a witness said.

16       I wish I could tell you that's power.    That's what

17  being a Judge is all about.    And it is very, very serious

18  responsibility.

19       And it doesn't make any difference if more witnesses

20  came here to testify to one matter as opposed to a smaller

21  number coming to testify to the contrary.    You decide what

22  weight to give the testimony of any number of witnesses that

23  appeared before you.

24       We attorneys love to use the word impeachment,

25  discreditation.    You probably heard it during the course of

1    the trial.    We attorneys love to do that.

2              What does that mean?  For if it happened, and you are

3    the ones who decide that.  That a person may have come before

4    you and stated something differently than they had at another

5    time or described an event in one way and they having

6    described it another way at another time.  We call that

7    impeachment.

8              If you believe that any witness has been so

9    impeached, it is within your exclusive province to give the

10   testimony of that witness such credibility or weight, if any,

11   you think it deserves.

12             You had before you several persons that testified who

13   have been convicted of a felony.   And that's a factor that

14   you may consider in weighing the credibility of that

15   witness.   The fact of such a conviction does not necessarily

16   destroy that person's credibility, but it is one of those

17   circumstances you may take into account in determining the

18   weight that you are to give to the testimony of that

19   witness.

20             In this case you had persons who appeared before you

21   who were accomplices, who were allegedly involved in

22   committing the offense or offenses charged in the offense, who

23   entered into plea agreements, who became informants for the

24   Government and received some kind of promise of immunity.

25             Now, the testimony of all of these kinds of persons

1   is added testimony.    The Government can use these kinds of

2   persons to give testimony for them.    But you have to decide

3   whether that individual's testimony has been affected by any

4   of those circumstances; by the interest -- in the outcome of

5   the case, about prejudice against the defendant, about

6   benefits that they have received either financially or as a

7   result of being immunized from prosecution.  And if you

8   determine that the testimony of those witnesses was affected

9   by any one or more of those factors, you should always keep in

10  mind that such testimony is always to be received with caution

11  and weighed with great care.

12         You should never convict any defendant upon the

13  unsupported testimony of such a witnesses unless you believe

14  that testimony beyond a reasonable doubt.

15         In any criminal case the Government must prove not

16  only the essential elements of the offense or offenses as

17  charged, as hereinafter defined, but must also prove, of

18  course, the identity of the defendant as the perpetrator of

19  the alleged offense or offenses.

20         In evaluating the identification testimony of a

21  witness, you should consider all the factors already mentioned

22  concerning your assessment of the credibility of any witness

23  in general, and should also consider, in particular, whether

24  the witness had an adequate opportunity to observe the person

25  in question at the time or times about which the witness

1 testified.

2 　　　　You may consider in that regard such matters as the

3 length of time the witness had to observe the person in

4 question, the prevailing conditions at that time in terms of

5 visibility or distance and the like, and whether the witness

6 had known or observed the person at earlier times.

7 　　　　You may also consider the circumstances surrounding

8 the identification, itself, including, for example, the manner

9 in which the defendant was presented to the witness for

10 identification and the length of time that elapsed between the

11 incident in question and the next opportunity the witness had

12 to observe the defendant.

13 　　　　If after examining all the testimony and evidence in

14 the case you have a reasonable doubt as to the identity of the

15 defendant as the perpetrator of the offense or offenses

16 charged, you must find the defendant not guilty.

17 　　　　The rules of evidence provide that if scientific,

18 technical or other specialized acknowledge might assist the

19 jury in understanding the evidence or in determining a fact in

20 issue, a witness qualified as an expert by his or her

21 knowledge, skill, experience, training and education may come

22 and testify before you and express his or her opinion.

23 　　　　And listen to this.  You should consider such expert

24 testimony received in evidence in this case and give it such

25 weight as you think it deserves.

1    If you should decide the opinion of an expert witness

2  is not based upon sufficient education and experience or you

3  should conclude that the reasons given in support of that

4  opinion is not sound or the opinion is outweighed by other

5  evidence, you can even disregard the opinion of an expert

6  entirely.

7    Now, what are you going to have before you?  You are

8  going to have several counts that you are going to consider.

9  You are going to have Count Number 1 which alleges a

10  conspiracy with possession with the intent to distribute, and

11  then you are going to have some substantive counts, that is,

12  possession with intent to distribute marijuana.

13    And then you are going to have what we call

14  substantive counts.   You are going to have three or four

15  counts, all of which allege or which are the so called

16  substantive counts, the possession with the intent to

17  distribute marijuana.

18    And then finally you are going to have another count

19  involving the big word conspiracy.  And we will explain that

20  to you in just a moment.  And in that count the object of the

21  conspiracy, the Grand Jury alleges, was the money laundering

22  issue.   Remember the money laundering.   In a nutshell I will

23  tell you --  and I will explain it to you in detail, and you

24  wait until I give you all the instructions.  Money laundering

25  is simply, in a nutshell, a situation where the origin of

1    monies are a result of illicit -- in this case -- drug

2    activities and they are used to promote unlawful

3    activities -- in this case additional drug activities -- and

4    they are used in such a way by --  in such a way to disguise

5    or conceal the origin of that money.

6           And so Count Number 9 says that the -- alleges, and

7    remember these are just statements, they are subject to proof

8    in your finding, that the defendant engaged in another

9    conspiracy and this was to launder money.

10          But as would regard all of the first few counts,

11   which involve and entail the conspiracy to possess with intent

12   to distribute, the element of possession becomes very

13   important.

14          And under the laws of the United States, you see,

15   there are two kinds of possession.   See this pen.   I have it

16   in my hand, don't I?  And I have actual, physical control over

17   this pen.   And that's my intention to do that.   I am in

18   actual possession of it.

19          See that pen.   I am no longer in physical control of

20   that pen.   But so long as it is my --  it is my intention to

21   exercise control and dominion over that pen, I am in

22   constructive possession of that pen.

23          You can be in Brownsville and you can send somebody

24   to go get an item or do something for you in Harlingen and you

25   are not in Harlingen where they obtained that item.   But, you

1   see, if it was your intention to exercise control and dominion

2   over that thing in Harlingen, you are in constructive

3   possession of that thing.

4          And possession, you see, can be either sole or

5   joint.   If one person had either actual or constructive

6   possession of a thing, that is joint possession.   If two or

7   more persons have actual or constructive possession of a

8   thing, that is what we call joint possession.

9          With respect to the element of possession, you can

10  find that element is present if you find beyond a reasonable

11  doubt that the defendant had actual or constructive possession

12  of the drugs in question, either alone or jointly with

13  others.

14         And also under the laws of the United States, it is

15  not necessary for a person to actually commit the crime to be

16  as guilty as the one who actually committed the crime.

17         I always introduce the law of aiding and abetting

18  through a Spanish saying that some of us may be very aware of,

19  and that is, "he who holds the cow's leg is just as guilty as

20  the one who shot the cow in the head."  Why?  Because if

21  somebody hadn't kept the cow in place, it wouldn't have been

22  in place for somebody to shoot it in the head.

23         You see, if another person is acting under the

24  direction of the defendant, or if the defendant joins another

25  person and performs acts with the intent to commit a crime,

1   then the law holds that defendant responsible for the acts and

2   conduct of the other person just as though he had committed

3   the acts or engaged in such conduct.

4        Notice, however --  and now we are going to come to

5   some terms that become very important.   Because what we are

6   going to introduce, you see, are some terms that really tell a

7   story about the way we do things in our country.  Because it

8   can appear by the way you see things and on the surface of

9   things that a person committed a crime, but if a person did

10  not engage in that conduct knowingly and willfully, with the

11  required state of mind, we can't find that person guilty.

12       So notice, however, in making reference to this

13  aiding and abetting, where you contribute knowingly and

14  willfully to the commission of the crime, that before a

15  defendant may be held criminally responsible for the acts of

16  others, it is necessary that he deliberately and then

17  knowingly and willfully, knowingly and willfully, associate

18  himself in some way with the crime and participate in it with

19  intent to bring about the crime.   Excuse me.

20       And mere presence, just because you are where a crime

21  is being committed, or mere knowledge, just because you know a

22  crime is being committed, does not make you guilty.   Because,

23  you see, in order to show that a person directed or aided and

24  abetted the crime, you have to find beyond a reasonable doubt

25  that the defendant was a knowing and willful participate.    I

1   am going to define knowing and willful for you.  That he was a

2   knowing and willful participant and not merely a spectator.

3          With respect to the element or the aiding and

4   abetting law, I will tell you that you cannot find the

5   defendant guilty unless you find beyond a reasonable doubt

6   that every element of the offense or offenses, as I am going

7   to define them to you, were committed by some person or

8   persons and that the defendant voluntarily, knowingly and

9   willfully, participated in the commission with the intent to

10  violate the law.

11          Then we come to two definitions.  You will have for

12  your consideration Count 1, the conspiracy to possess with

13  intent to distribute.  You will have Count 2, I believe Count

14  3 and I believe Counts 6, 7 and 8.  Anyway, you will have

15  several substantive counts that allege that the defendant

16  possessed, as I have defined possession with you, on a

17  specific day a specific amount of marijuana with the intention

18  to distribute it.

19          And then, of course, Count Number 9 which alleges a

20  conspiracy to launder money.

21          And I will tell you now that there is going to be a

22  second phase to this trial, the forfeiture issue.  That's

23  separate from this particular issue, and that's something that

24  we will address subsequently.  I tell you that for your

25  information.

1   Let's go to these definitions.   You will find that

2   every count that you will have under consideration begins with

3   the allegation -- remember that's a statement -- that the

4   alleged offense took place on or about a certain date.

5   Now, the proof does not have to establish with

6   certainty the exact date of the alleged offense or offenses.

7   It is sufficient if the evidence in the case establishes

8   beyond a reasonable doubt that the offense or offenses were

9   committed on a date reasonably near those alleged in each

10   count of the indictment.

11   Now we come to two terms that are very important, the

12   word knowingly and the word willfully.   What do they mean?

13   Knowingly means that you did what you did voluntarily

14   and intentionally, because you wanted to do it, and not by

15   accident or mistake.

16   What does willfully mean?  Willfully means that you

17   did what you did voluntarily and purposely -- because you

18   wanted to do it -- and with the specific intent, with the

19   specific intent, to do something that the law forbids.

20   I earlier told you that Count Number 1 and Count

21   Number 9 allege a conspiracy.

22   Count Number 1 alleges a conspiracy to possess with

23   intent to distribute marijuana.

24   Count Number 9 alleges a conspiracy with money

25   laundering.

1    Well, the predicate for Count Number 1 has to do with

2  those substantive counts involving allegations that the

3  defendant possessed with intent to distribute certain amounts

4  of marijuana on a certain date, on a certain date, as alleged

5  in each one of the counts.

6    And the predicate for Count Number 9 is that the

7  defendant engaged --  that the object of the conspiracy was to

8  launder money.

9    So let's start first with not Counts 1 and 9 but

10  let's go to the substantive counts and then we will get to

11  that big word conspiracy.

12    Counts 2, 4, 6, 7 and 8, those substantive counts,

13  whatever they may be, involving possession with intent to

14  distribute, allege that the defendant possessed, as I have

15  defined possession to you, the alleged amount of marijuana on

16  the alleged date with the intention to distribute it.

17    It is a violation of the laws of the United States

18  for a person to possess with intent to distribute a controlled

19  substance.   Marijuana is a controlled substance.

20    Now, what must you find beyond a reasonable doubt

21  before you can find the defendant, Javier Lopez Cantu, guilty

22  of any of those counts that I have -- that I have called to

23  your attention regarding possession with intent to

24  distribute?  Three things.

25    First, that he knowingly and willfully possessed the

1  marijuana in question.

2          In addition to that, that he knew he was in

3  possession of the marijuana in question.

4          And, in addition to that, that he possessed the

5  marijuana in question with the intention to distribute it.

6          With respect to all of the substantive counts

7  involving the possession of marijuana, if you find that the

8  Government has proven those matters beyond a reasonable doubt

9  that I have just mentioned to you, you should find the

10  defendant guilty.

11          If you do not -- if you are not satisfied that the

12  Government has proven those matters beyond a reasonable doubt,

13  you should find the defendant not guilty of possession --  of

14  the possession counts, substantive counts, of marijuana with

15  intent to distribute.

16          Now, to possess with intent to distribute simply

17  means to pass it on to somebody else.   It means to possess

18  with intention to deliver or transfer possession of a

19  controlled substance to another person with or without any

20  financial interests in the transaction.

21          So let's go now -- that makes reference to the

22  predicate for Count Number 1 and the substantive counts

23  involving possession with intent to distribute.

24          Count Number 9 alleges conspiracy --  and remember I

25  am going to tell you what that is in just a few moments --  to

Case 1:00-cv-00154   Document 1   Filed in TXSD on 10/04/2000   Page 47 of 121

1  launder money.

2       Let's introduce the matter of laundering money --

3  and remember you wait until I give you all of the law.   Don't

4  take any one thing I say as the controlling factor in this.

5       But let us introduce the money laundering in this

6  fashion.   In general, it is obtaining funds from illegal

7  activities.   In this case they allege drugs.   They originated

8  because of drug activity.   It is using them to promote, you

9  know, the illegal activities, and disguising those monies so

10 as to conceal the origin of those monies.   Because, you see,

11 it is a crime for anyone to knowingly use proceeds of certain

12 illegal activities, to promote the carrying on of certain

13 illegal activity, to knowingly conceal or disguise the nature,

14 locations, source of ownership or control of those proceeds.

15      Now, the offense of money laundering is made up of

16 several elements, just like the possession with intent to

17 distribute marijuana.

18      For example, element Number 1, the offense is made

19 up --  one of the elements, first element --  remember all of

20 these are the elements that constitute money laundering --  it

21 requires that the defendant knowingly conduct or attempt to

22 conduct a financial transaction.   All right.

23      What is a transaction?   A transaction includes a

24 purchase, sale, loan, gift, transfer, delivery, disposition

25 with respect to a financial institution or deposit,

 1   withdrawal, transfer between accounts, exchange of currency,

 2   loan, extension of credit, purchase or sale of any stock,

 3   bond, certificate of deposit, or any monetary instrument, or

 4   any other payment, transfer, or delivery by, through, or to a

 5   financial institution, by whatever means effected.  That's

 6   what transaction means.

 7            A financial transaction means any transaction, as

 8   that term has just been defined, which involves the movements

 9   of funds by wire or other means or involving one or more

10   monetary instruments, which in any way or degree affects

11   interstate or foreign commerce, or a transaction involving the

12   use of a financial institution which is engaged in, or the

13   activities of which affect, interstate or foreign commerce in

14   any way or agree.

15            Interstate or foreign commerce means something that

16   goes from one state to another state or from one country to

17   another state.

18            And it is not necessary for the Government to prove

19   that the defendant actually intended or anticipated an effect

20   on interstate commerce by his actions or that commerce was

21   actually going to be affected.

22            The conduct includes initiating  or concluding, or

23   participating in initiating or concluding a transaction.

24            Proceeds, proceeds, includes any property, or any

25   interest in property, that someone acquires or retains as a

1    result of the commission of the underlying specified unlawful

2    activity.  And proceeds can be any kind of property, not just

3    money.

4         So, you see, the elements that constitute the offense

5    of money laundering -- and we will go back -- require that

6    it be proven that a defendant knowingly conducted a financial

7    transaction; that the financial transaction involves the

8    proceeds of specified unlawful activity; in this case, drugs.

9    In addition to that, that the defendant knew that the property

10   involved in the financial transaction represented proceeds

11   from some unlawful activity, in this case, drugs; and that the

12   defendant intended to promote the carrying on of the specified

13   unlawful activity; and that the defendant knew that the

14   transaction was designed, in whole or in part, to conceal,

15   disguise the nature, the location, the source, the ownership

16   of the control of proceeds.

17        That is the money laundering law in a nutshell.    All

18   right.

19        What the Government says in Count Number 1 is that

20   the defendant engaged in a conspiracy to possess with intent

21   to distribute marijuana.

22        What the Government says that the defendant did in

23   Count Number 9 is to engage in a conspiracy to launder

24   money.   That's why it is important that you understand what

25   the definitions are regarding possession of marijuana because

1  that is the predicate for Count Number 1 and money

2  laundering.

3          What is a conspiracy?  Mr. Holloway and I, my court

4  reporter, decide --  we have been doing this for 17 years.  It

5  worked about six or seven years ago because we got a raise but

6  we need another one.  So you might want to write your

7  congressman.  But he and I decide that we don't get paid

8  enough money.   And so he and I go to my chambers -- that's

9  what you call the Judge's office -- and we decide that the

10  way we are going to make more money is to rob a National

11  Bank.   Now, all of us know robbing a National Bank is a

12  violation of Federal law.  And we go to into my office and we

13  engage in a plan to violate the law.

14          Then we solicit the services of Mr. Esparza, one of

15  the attorneys who assist me, to go rent a getaway car.

16          The moment that Mr. Esparza has rented that getaway

17  car, we have committed a conspiracy and violated the laws of

18  the United States.   Even if we didn't rob the bank.

19          Now, if we rob the bank, it doesn't make us any less

20  guilty of the conspiracy.

21          You see, this is so because under the law of a

22  conspiracy, you sort have an agreement or kind of partnership

23  in criminal purposes in which every member becomes the agent

24  or partner of every other member.

25          There are certain things the Government does not have

1  to prove to you.   Perhaps it is more important for you to be

2  mindful of the fact not what the Government does not have to

3  prove to you but what the Government must prove to you.   And

4  I will come to those matters in just a moment.

5       For you to find the defendant guilty of Count Number

6  1 and/or Count Number 9 --  Count Number 1 being the

7  conspiracy to possess with intent to distribute marijuana;

8  Count Number 9, conspiracy to launder money --  you must be

9  satisfied that the Government has proven all of these

10  following matters beyond a reasonable doubt.

11       Number 1, that two or more persons made an agreement

12  to commit the crime of Count Number 1, possession with intent

13  to distribute marijuana, and Count Number 9, to launder

14  money.  That two or more persons engaged and entered into a

15  plan to violate the law.

16       Number 2, that the defendant knew the unlawful

17  purpose of the agreement and joined in it -- remember that

18  word -- willfully, that is, with the intent to further the

19  unlawful purpose.

20       Number 3, that one of the conspirators during the

21  existence of the conspiracy knowingly committed at least one

22  of the overt acts described in the indictment in order to

23  accomplish some object or purpose of the conspiracy.   The

24  overt acts are set out in Count Number 1 and in Count Number

25  9.

1       If you are satisfied that the Government has proven

2  those three things beyond a reasonable doubt, you should find

3  the defendant guilty of Count Number 1 and/or Count Number

4  9.

5       If you are not satisfied that the Government has

6  proven those matters beyond a reasonable doubt, you should

7  find the defendant not guilty of Count Number 1 and/or Count

8  Number 9.

9       You can become a member of a conspiracy without

10  knowing all the details of the unlawful scheme or the

11  identities of all the alleged conspirators.   If you

12  understand the unlawful nature of a plan or scheme and

13  knowingly and intentionally joined in that plan or scheme on

14  one occasion, on one occasion --  if Mr. Esparza knew why he

15  was going to go rent that getaway car and didn't do anything

16  except just to engage in that conduct on one occasion --  that

17  is sufficient to convict him for conspiracy even though he has

18  not participated before and even though he only played a minor

19  part.

20       There are certain things the Government does not have

21  to prove.   Remember, those are not the important things.

22  What are important is what the Government must prove.  And I

23  have already told you what that was.

24       For example, the Government doesn't have to prove

25  that the conspirators entered into any formal agreement.

1    Mr. Holloway and I are not going to write our plan to rob the

2    bank and put it on a blue back.  You understand that.  They

3    don't have to prove that.   Nor does the Government have to

4    prove that the conspirators stated between themselves all the

5    details of the scheme.   The Government does not have to prove

6    that all the details of the scheme alleged in the indictment

7    were actually agreed upon, to carry it out, nor must the

8    Government prove that all the persons alleged to have been

9    members of the conspiracy were in fact members of that

10   conspiracy, or that the alleged conspirators actually

11   succeeded in accomplishing their unlawful objectives.

12        And, here again, mere presence at the scene of an

13   event --  just because you are there --  or mere knowledge

14   that a crime is being committed, or the mere fact that certain

15   persons may have associated with each other and they have

16   assembled together and discussed common aims and interests,

17   does not necessarily establish proof of the existence of the

18   conspiracy.

19        A person who has no knowledge that a conspiracy but

20   who happens to act in a way which advances some purpose of a

21   conspiracy does not thereby become a conspirator, unless what

22   he did he did knowingly and willfully.

23        And remember also that the defendant is charged with

24   that conspiracy that's alleged and made a part of Count Number

25   1.   And he is not being charged with any other

1  conspiracies.

2       You must -- with regard to that conspiracy offense

3  in Count Number 1, that proof -- that does not entail proof

4  of several separate conspiracies. You must -- you must

5  address only that which is alleged in Count Number 1 as being

6  the conspiracy to which the defendant is being subjected in

7  this case.

8       And if you find that the defendant is a member of

9  another conspiracy but not that one charged in the indictment,

10 then you must find the defendant not guilty.

11      To find the defendant guilty, you must find that he

12 was a member of that conspiracy charged in the indictment and

13 not some other conspiracy.

14      Now, also, a conspirator is responsible for the

15 offenses committed by other conspirators if the conspirator

16 was a member of that conspiracy when the offense was

17 committed.  And if the offense was committed in furtherance

18 of or as a foreseeable consequence of the conspiracy.

19      If you find that the  -- if you have found the

20 defendant guilty of the conspiracy charge, that other persons

21 were guilty of those offenses charged in the substantive

22 counts, and you find beyond a reasonable doubt that during

23 that time the defendant was a member of that conspiracy while

24 other conspirators committed the offenses, made reference to

25 as the substantive counts, in furtherance of or as a

1    foreseeable consequence of that conspiracy, you can find the

2    defendant guilty even of the substantive counts, even though

3    he may not have participated in any of that which constitutes

4    the offense described in the alleged substantive counts.

5         That constitutes the main part of your charge.  What

6    is it?  The law by which you will be governed during your

7    deliberations.

8         I have a few remaining cautionary instructions.

9    After the attorneys address you in the morning, I will give

10   you those cautionary instructions and then you will begin your

11   deliberations.

12        We are going to recess as far as you are concerned.

13   The attorneys and I are going to do a little bit more work

14   here.  Be very mindful of your instructions.  Do not discuss

15   nor permit anyone to discuss anything whatsoever about this

16   case with you.   You may have already memorized it because it

17   is just that important.   Do not read anything, hear anything

18   or watch anything about this case.

19        And with the time schedule that we keep, you can't

20   anyway, probably, because you go straight to bed.   Just the

21   same, be very mindful of those instructions.

22        Do take care of yourselves and we will begin our work

23   tomorrow at 9 o'clock.

24        Everybody rise and remain in place while the jury

25   retires.

1  that, likewise, he is guilty as charged of any involvements in

2  the conspiracy of a variety of people to launder money.   And

3  I ask that you so say by your verdict of guilty as charged in

4  this indictment.

5           Thank you very much for your time and your attention.

6           THE COURT:  All right, ladies and gentlemen of the

7  jury, a separate crime is charged or offense is charged in

8  each count of the indictment.  Each charge and the evidence

9  pertaining to it should be considered separately.  In other

10  words, you can consider all the evidence in the case but you

11  address each count separately, independently, and apart from

12  all other counts in the case.

13          The fact that you find the defendant guilty or not

14  guilty of any one count should not control your verdict as to

15  any other count.

16          And remember you are here to determine the guilt or

17  innocence of the defendant from the evidence in this case.  He

18  is not on trial for any other thing other than what is alleged

19  in the indictment.

20          And neither are you called upon to return a verdict

21  as to the guilt or innocence of any other person who is not on

22  trial before you.

23          The punishment, as provided for by law, is a matter

24  exclusively within the province of the Judge or the Court.

25  And the jury should never, never consider punishment in

1  attempting to reach a verdict as to the guilt or innocence of

2  the defendant on trial before them.

3       Now, any verdict that you return must represent the

4  considered judgment of the 12 of you who will be

5  deliberating.   In order for to you find the defendant guilty

6  or not guilty of any count, all 12 of you must be in unanimous

7  agreement.   All your verdicts must be unanimous.

8       It is your duty as jurors to consult with one another

9  and to deliberate in an effort to reach an agreement in this

10 case.

11      It is your duty as jurors to attempt to reach a

12 verdict as to each and every one of the counts that you will

13 have before you.   You have a duty to reach a verdict, so long

14 as you can do so without violence to individual judgment.

15      Now, you have to decide the case for yourself, but

16 you do that after fair, careful and impartial consideration

17 and discussion of the evidence with your fellow jurors.

18      And in the course of your deliberations do not

19 hesitate to change your mind, if you are honest to goodness

20 convinced that you are wrong, but for God's sake don't change

21 your mind just to get your work done or to satisfy your fellow

22 jurors.   You must always remember that you are judges, you

23 are not partisans, and your only concern and interest in this

24 case is to ascertain the truth.   What happened or did not

25 happen.

1    Now, the first thing that you will do when you return

2  from lunch is that you will -- you will get together in the

3  deliberation room and select one of your members as your

4  foreperson.   That individual will preside over your

5  deliberations and also be your spokesperson in open court.

6    You will be favored with a verdict form which is

7  self-explanatory.   A reference to be made to each and every

8  one of the counts that you will have under consideration and a

9  space for you to make the entry once you reach a unanimous

10  verdict as to each and every count.

11    You will take that verdict form with you.   The

12  foreperson should cause all entries to be made by him or

13  her.   And after a verdict has been reached as to each and

14  every count, the foreperson should sign the verdict form and

15  date it and, of course, you will be returned to the open

16  courtroom so your verdict can be made public.

17    If in the course of your deliberations you desire to

18  send a message or communicate with the Court --  and although

19  this case was of some duration, there will be 11 other people

20  there and you will remember the evidence.   But,

21  notwithstanding, that is my way of not encouraging you or

22  discouraging you from sending any messages.   But if you do,

23  you reduce that message to writing, have your foreperson sign

24  it, date it, and put the hour thereon.

25    Now, one thing we do not do around here is ignore

1  jury messages. `  I may be looking for an answer for it or I

2  may be doing something else.   So if you ever do send a

3  message and it is consistent with what your conscience

4  dictates, you continue your deliberations s.   If it is

5  consistent with what your conscience dictates, you continue

6  your deliberations.

7         I am going to ask you to do me one final favor.   If

8  you ever do send a message, do not, do not, do not specify

9  your numerical division.   So many people voting one way and so

10  many people voting another way.   Please do not do that.

11         Any further objections from either side?

12         MR. LEWIS:   Not from the United States, Judge.

13         MR. FLOOD:   None from Mr. Cantu, Your Honor.

14         THE COURT:   Very well.  All right, Sylvia R. Aguirre

15  and Luis A. Ramos, you were the alternates.   You know why we

16  select alternates.  We select alternates precisely for cases

17  like this.  If we had not worked overtime during the course

18  of the week, we might would have gone into a couple of

19  weeks.   For if something were to happen to one of our

20  jurors.   Fortunately nothing happened to any of our jurors.

21  However, I am going to ask that you please keep to all

22  instructions I have given you for the next few days, for the

23  event we do need your services.

24         Do not discuss nor permit anyone to discuss anything

25  whatsoever about this case with you.

1      Now, you are free to go at this time to your business

2  or whatever your personal desires are with our gratitude.

3  Thank you very much, and do keep to your instructions, will

4  you please.

5      Please have them escorted to their vehicles.

6      U.S. MARSHAL:  Yes, Your Honor.

7      THE COURT:  All right, ladies and gentlemen of the

8  jury, obviously every instruction I have given you during the

9  course of the trial becomes ever more important now that the

10  case is in your hands.  All of them, including the Court's

11  charge, the instructions that I gave you yesterday and today.

12  They are certainly matters that should always be with you and

13  you should adhere to very, very religiously.

14      I am to give you one additional instruction.  You

15  decide when to take your recesses by the vote of all 12 of you

16  or through the foreperson or the like.  If you ever do

17  separate like to get a refreshment or the like, never, never

18  discuss the case unless all 12 of you are present.   Never

19  discuss the case unless all 12 of you are present.

20      So there won't be any anxiety or nervousness, I will

21  repeat what schedule we are going to keep to.  That you should

22  not misunderstand.   It is not an invitation for you to do

23  anything.   Just my information to you because I know you have

24  matters to take care of.

25      We will recess today at 5:00.   We will resume our

1  work tomorrow at 9:00.  And then, if you are still

2  deliberating, we will recess tomorrow at 5:00 until Monday.

3         So depending upon what your conscience dictates,

4  that's the schedule we will adhere to.

5         And be very mindful of the fact, as you begin your

6  deliberations, that all instructions apply with ever more

7  importance.

8         What is going to be done at this moment, when you go

9  to the deliberation room, arrangements will be made for you to

10  have your lunch.  When you return you can begin your

11  deliberations.

12         Everybody rise and remain in place while the jury

13  retires.

14

15         [WHEREUPON, the jury left the courtroom, after which

16  the following proceedings were had before the Court:]

17

18         THE COURT:  So that the -- all right, so the record

19  will be correct, neither side had any further objections after

20  the Court concluded presenting the charge to the jury, is that

21  so?

22         MR. LEWIS:  Correct, Judge.

23         MR. FLOOD:  Correct, Your Honor.

24         THE COURT:  Gentlemen, I commend you.   I can't think

25  of a better tried lawsuit.   It was clearly -- it is clearly

1    Counts, I believe, 3, 4 and 5 -- rather --  4, 5 and 6 with

2    them.    Those counts were all dismissed.    They don't have

3    those counts.

4                MR. FLOOD:  All right.

5                THE COURT:  All rise for the jury, please.

6

7                [JURY PRESENT]

8

9                THE COURT:  The jury may be seated.

10               Everybody may be seated.

11               Ladies and gentlemen of the jury, I have received

12   your Jury Note Number One in which you ask for clarification

13   of some counts.    That is perfectly all right.    You know, we

14   very much are aware of the fact that you are not trained in

15   law and that when you are exposed to things sometimes for the

16   first time as to what we call substantive counts and

17   conspiracies that it does merit, for example, further

18   explanation or further discussion, further instruction, from

19   the Court.    That is perfectly all right.    There is nothing

20   wrong with having things clarified.

21               So what I am going to call to your attention and

22   remind you of is remember everything I have told you remains

23   the same.    Remember this morning I told you in the

24   instructions you consider each count separately and

25   independently and apart from all other counts.    And because

Case 1:00-cv-00154   Document 1   Filed in TXSD on 10/04/2000   Page 63 of 121

1    you find the defendant guilty or not guilty of one count

2    should not control your verdict as to any other count.   You

3    address each count separately.

4         Count Number 1 alleges a conspiracy to possess with

5    intent to distribute marijuana.

6         Count Number 9 alleges a conspiracy to launder

7    money.   All right.   So leave conspiracy aside.

8         What constitutes the offense of conspiracy is not

9    what constitutes the offense of possession with intent to

10   distribute.

11        And I am going to go through all of this, so don't

12   take one thing as I say what governs the discussions or the

13   explanation.

14        For example, you remember I told you yesterday that

15   in a conspiracy you don't have to rob that bank.   If you

16   engage in a plan to violate the law and then you engage in an

17   overt act that is alleged, you understand, even if you don't

18   rob the bank, you still have committed a conspiracy.

19   Remember I said that?

20        That is not true of the substantive counts.   The

21   substantive counts allege that the defendant possessed with

22   the intent to distribute the marijuana in question.   As I

23   explained possession, as I explained aiding and abetting to

24   you.

25        So maybe that is why when we were talking yesterday I

1   first started off with the substantive counts.   And then

2   there are some overt acts --  and you may be --  because you

3   say --  you make reference to Counts 2, 3, 4, 5 and 6.  And I

4   don't think you have for consideration Counts 4, 5 and 6.   So

5   I guess you are making reference to perhaps the overt acts.

6          In Count Number 1 --  in Count Number 1 they allege

7   certain overt acts and in Count Number 9, which is the

8   conspiracy also, they allege overt acts.

9          The reason those are alleged is because, you see,

10  under the law of conspiracy, the elements of a conspiracy

11  entails the fact that one of the overt acts had to be

12  committed by somebody.   Okay.   But the overt acts do not

13  necessarily constitute the offenses alleged in the substantive

14  counts, the other counts.   Okay.

15         So the reason we start with the substantive counts,

16  that is because of the fact they allege possession with the

17  intent to distribute marijuana.

18         The predicate for conspiracy to possess with intent

19  to distribute marijuana is the possession with intent to

20  distribute marijuana.   So that's why, for example, we first

21  start off with a substantive count.

22         I said, "Let's not talk about Count Number 1 or 9

23  yet.   Let's talk about what constitutes possession with the

24  intent to distribute marijuana".

25         Now, remember under the law of conspiracy you can be

1   found guilty even though you did not rob that bank.   But

2   remember, also, everything I told you, and I emphasize to you

3   that before a person can be found guilty of any of these nine

4   charges, you must find that the person committed the act, as I

5   have defined and will continue to define them to you, and that

6   the person did it knowingly and willfully.   All right.

7           Remember, as an example when he introduced the law of

8   conspiracy, I said, well, Mr. Holloway and I decide that we

9   were going to make more money by robbing the bank and we

10  engage in that plan.   And then we engage the services of

11  Mr. Esparza who is one of the attorneys who assist me, and we

12  have him go rent the getaway car.

13          I said to you, the moment he rented that getaway car

14  we have violated the laws of the United States, even if we

15  didn't rob the bank.

16          The question arises, did Mr. Esparza violate the law?

17  That is going to depend upon what?   Whether when he went to

18  rent that getaway car he did that knowingly and willfully.

19          We will get to conspiracy in a minute.   That's that

20  partnership in a crime in which everybody becomes the agent of

21  everybody else.

22          Let's talk about the substantive counts which will be

23  Counts 2, 3, 4 --

24          MR. FLOOD:   Judge, I don't recall --   I don't think

25  there is any aiding and abetting count.

1          THE COURT:   Those substantive counts will allege

2     aiding an abetting.    All substantive counts will include

3     aiding and abetting.

4          It will be Counts, 2, 3, 7 and 8.    Those are the

5     ones that allege that the defendant in his own right, by

6     aiding and abetting, possessed with intent to distribute the

7     marijuana in question.

8          What constitutes the offense involving possession

9     with intent to distribute?  You must find all of the following

10    things beyond a reasonable doubt:

11         Number One, that the defendant knowing and willfully

12    possessed the marijuana in question, as I have defined

13    possession for you.

14         In addition to that, that he knew he was in

15    possession, as I will defined possession for you, of the

16    marijuana in question.

17         And, in addition to that, that he possessed it with

18    the -- possessed the marijuana with the intent to distribute

19    it.

20         If you find all three of those things with respect to

21    Counts 2, 3, 7 and/or 8, you should find the defendant guilty

22    of Count Number 8.

23         If you don't find that the defendant engaged in that

24    conduct knowingly and willfully as would regard any of those

25    counts, you should find the defendant not guilty of those

Case 1:00-cv-00154   Document 1   Filed in TXSD on 10/04/2000   Page 67 of 121

1    counts.   All right.   Those are the substantive counts.

2         Now, conspiracy to possess with intent to distribute

3    is that matter that we related to and we went over yesterday

4    when we defined conspiracy.   What's a conspiracy?   It is a

5    plan where two or more persons engaged in and willfully

6    participate in a plan --  participated in a plan to violate

7    the law.

8         It is that thing that I told you, you don't have to

9    rob the bank to be guilty of the conspiracy.   But if you rob

10   it, you -- that doesn't make you any less guilty of a

11   conspiracy.   Okay.

12        Now, also, you must distinguish between overt acts

13   and counts.   The ones I just read to you were counts.   The

14   overt acts are those that are alleged in Count Number 1 and

15   Count Number 9.   Remember reading those since you have the

16   indictment?

17        Now, we said a conspiracy is an agreement between two

18   or more persons to join together to accomplish some unlawful

19   purpose.   It is kind of a partnership in crime in which every

20   member becomes the agent of every other member.

21        Now, for you to find the defendant guilty of Count 1

22   and/or Count 9, these are the things that must be proven to

23   your satisfaction beyond a reasonable doubt.   That's a

24   conspiracy, possess with intent to distribute, and, Number 9,

25   to conspire to launder money.   Okay.

CMsPDF - www.tacsa.com

 1           Number One, with respect to 1 and 2, that two or more

 2   persons made an agreement to commit the crime of -- with

 3   respect to Count Number 1 --  possess marijuana with intention

 4   to distribute it.   With respect to Number 9, to launder

 5   money.    That two or more persons engaged and willfully

 6   participated in a plan to violate the law.    Number One.

 7           Number Two --  here is what's important --  that the

 8   defendant knowingly and willfully joined in that unlawful

 9   agreement or plan to violate the law with the intent to

10   further the unlawful purpose; that he knowingly and willfully

11   joined in that plan to violate the law.    All right.

12           In addition to that, that one of the conspirators,

13   one of the conspirators, during the existence of the

14   conspiracy knowingly committed at least one of the overt

15   acts -- remember the overt acts, that's different than the

16   substantive counts -- one of the overt acts described in the

17   indictment in order to accomplish some object or purpose of

18   the conspiracy.

19           If you find with respect to Count 1 and Count 9 that

20   the Government has proven those matters beyond a reasonable

21   doubt as would regard the defendant, you should find him

22   guilty of Count Number 1 and of Count Number 9.

23           If you find that the Government has failed to prove

24   all of those elements beyond a reasonable doubt with respect

25   to the defendant, you should find him not guilty of Count

1    Number 1 and of Count Number 9.

2           Remember that you can become a member of a conspiracy

3    even if you don't know all the details of the unlawful scheme

4    or even if you don't know the identities of everybody

5    involved.

6           If you understand the unlawful nature of a plan or

7    scheme and knowingly and intentionally -- remember I said

8    knowingly and willfully -- joined in that plan or scheme on

9    one occasion, that is sufficient for conviction of a

10   conspiracy even though you have not participated in it before

11   and even though you played only a minor role.

12          Remember I said all Mr. Esparza had to do was go rent

13   that car.   When he went to rent that getaway car, if he knew

14   why he went to rent that getaway car, that's all he had to

15   do.  He didn't have to do anything else.

16          Now, remember there are certain things that don't

17   have to be proved.   They don't have to prove that it is a

18   formal agreement in writing, the persons who are going to

19   violate the law.

20          The Government doesn't have to prove that everybody

21   stated between themselves all the details of the scheme.  The

22   Government doesn't have to prove that all the details of the

23   scheme alleged in the indictment were actually agreed upon or

24   carried out.  Nor must they prove that all the persons alleged

25   to have been members of the conspiracy were such or that the

1   alleged conspirators actually succeeded in accomplishing their

2   unlawful objectives.

3         And remember, here again, mere presence, because you

4   were at the scene of an event, even with knowledge that a

5   crime is being committed, does not make you guilty, or the

6   mere fact that persons may have associated with each other and

7   may have assembled together and discussed common aims and

8   interests does not necessarily establish proof of the

9   existence of a conspiracy.

10        A person who has no knowledge of a conspiracy but who

11   happens to act in a way which advances some purpose of the

12   conspiracy does not thereby become a conspirator unless --

13   what -- he engaged --   he or she engaged in that plan

14   knowingly and willfully.

15        Does that help you?  Does that help you?  Is that

16   what you inquired about?

17        JUROR:  Not quite.  May I speak?

18        THE COURT:  Yes, sir.

19        JUROR:  We found repetition.

20        THE COURT:  You found repetition in what, sir?

21        JUROR:  In the counts.

22        THE COURT:  You didn't find repetition in the

23   counts.   You may have found repetition in the overt acts and

24   the counts, you understand.   Because Count Number 1 is the

25   conspiracy and that --  did you follow me?

1    JUROR:  Yes, sir.  I understand about the overt
2    acts.

3    THE COURT:  Okay, sir.

4    JUROR:  Let me put it another way.

5    THE COURT:  Sure.  You want to write it down?

6    JUROR:  It was in my paper.  Did you receive my --

7    THE COURT:  Yes, sir.  Yes, sir.  You say, "We find
8    that with the exception of Count 7 and 9 all other counts are
9    found in Count Number 1."

10   Count Number 1 simply alleges a conspiracy with the
11   intent -- with the intent to possess marijuana --  a
12   conspiracy to possess marijuana with intent to distribute it
13   from on or about 1985 to the time of the return of this
14   indictment.   That's what Count Number 1 alleges, you
15   understand.

16   That there was a conspiracy that began on or about
17   1995 up to the date of the return of this indictment, which
18   was in '97, to possess with intent to distribute marijuana.
19   That's what Count Number 1 alleges, you understand.

20   JUROR:  All right.   I am still having a little bit
21   of trouble on that.

22   THE COURT:  If you need some clarification, this is
23   the time to ask it.   You see, a conspiracy is not a
24   substantive count.

25   And the question that you would ask, can a conspiracy

1  involve substantive counts?  Yes.  But you consider the

2  conspiracy count separately and independently from all other

3  counts.  Why?  Because the elements of a substantive count,

4  possession with intent to distribute, are not necessarily the

5  elements of a conspiracy.  Why?  Because a conspiracy

6  involves two or more persons who engage in a plan to violate

7  the law.  All right.  And knowingly and willfully

8  participated in that plan.  All right.  Even if the offense

9  does not take place.

10       But for the substantive counts, you actually have to

11  commit the offense.

12       Now, when we say the conspiracy alleged in Count

13  Number 1 says, well, the -- and we don't -- the defendant is

14  charged from on or about 1985 to 1997, engaged in a conspiracy

15  to do what?  To possess with intent to distribute marijuana.

16  All right.

17       And then your question would be, well, can Count

18  Number 1 involve substantive counts?  Yes.  But the elements

19  of a conspiracy are not necessarily the same elements as the

20  substantive counts.  You understand that.

21       MR. FLOOD:  Your Honor, it might help also to charge

22  on multiple conspiracies, the deal about him --

23       THE COURT:  No, sir, already been charged with that.

24  No, sir.

25       JUROR:  We have not really gone into the conspiracy

1  that much.    What we were looking at is, you have Count Number

2  1 and then you have listed all these events or charges.

3           THE COURT:  Those are overt acts.

4           JUROR:  Overt acts.  Okay.  All of them?

5           THE COURT:  Yes, sir.

6           JUROR:  But then you go to Count Number 2, and you

7  give us a Count Number 2, what he is charged with.   Okay.

8  But that count is found in the overt acts of Count Number 1.

9           THE COURT:  Yes.

10          JUROR:  Let's say we find him innocent on Count

11  Number 2, Number 3, Number 4, Number 5 and Number 6.  Let's

12  say we find him innocent on those.  And for whatever reason

13  that would automatically make Count Number 1 also innocent

14  because he has been found --

15          THE COURT:  Let me answer your question this way.

16  Remember what you were told.   Any verdict you return on any

17  count should not control your verdict as to any other count.

18  You consider each count separately, independently and

19  apart from all others.   You understand that.

20          JUROR:  That's where the confusion was.   We thought

21  how can he be found innocent of Count 2, 3, 4, 5 and 6 and

22  then be found guilty of Count Number 1 when all those other

23  counts are included in the overt acts of Count Number 1.

24          THE COURT:  Well, each count alleges a separate

25  offense.   The elements of a conspiracy to possess with intent

1  to distribute marijuana are not the same elements as the

2  substantive count, possession with intent to distribute

3  marijuana.

4          JUROR:  Okay.

5          THE COURT:  Do you follow that?

6          JUROR:  I think so.  In reference to the conspiracy,

7  we haven't really gotten into that yet.

8          THE COURT:  Okay.  And do you need any further

9  instructions on the law of conspiracy?

10          And, remember, that he is charged in Count Number 1

11  with the conspiracy alleged in Count Number 1 and no other

12  conspiracy alleged in Count Number 1.  All right.  Any other

13  questions?

14          JUROR:  Not now, sir.

15          THE COURT:  Beg your pardon?

16          JUROR:  Not now, sir.

17          THE COURT:  Okay.  Remember, emphatically, each

18  count is a -- is to be considered separately and independently

19  and apart from all other counts.  The fact that you find a

20  person guilty of one count should not control your verdict as

21  to any other count.  You understand.  But you must be

22  satisfied before you find the defendant guilty of any count by

23  proof beyond a reasonable doubt of all the elements that

24  constitute an offense under the count that you have under

25  consideration.  And if you are not satisfied that it has been

1   proven beyond a reasonable doubt, you should find the

2   defendant not guilty, you understand, of all the elements.

3            Did that help you?

4            JUROR:  Yes.

5            THE COURT:  Perfectly all right to inquire.   I

6   mean --  I don't imagine that any of you have had experience

7   in trying a case involving a conspiracy with intent to

8   distribute or a conspiracy to launder money.   So it is the

9   right thing to do.  When you don't understand something, be

10  sure and let us know.   It is important for you to know

11  exactly how the law applies.   Nothing wrong with that.   So

12  don't feel badly about that.   We will gladly respond to any

13  inquiry that you have.

14           Anything else?  You may continue your

15  deliberations.   Please continue your deliberations.   I hope

16  that helps you.

17

18           [WHEREUPON, the jury left the courtroom, after which

19  the following proceedings were had before the Court:]

20           .

21           THE COURT:  Any objection from the Government?

22           MR. LEWIS:  No, sir.

23           THE COURT:  From the defendant?

24           MR. FLOOD:  No, Your Honor, none from the

25  defendant.

1          Your Honor, I have just a curious question.   If the

2  jury thinks that in December of 1987 Mr. Cantu helped Fabian

3  Cavazos transport 13 pounds of marijuana, okay, but find him

4  not guilty of all the substantive counts, let's say, the

5  way --

6          THE COURT:  They don't make a determination as to

7  what his relevant conduct is.  I do.

8          MR. FLOOD:  I understand that.   But I guess my point

9  is --

10          THE COURT:  In other words, the irony of cases like

11  this, is that he can be found innocent of all the substantive

12  counts and under the scheme of the Sentencing Guidelines he

13  could face worse consequences if he is found guilty of the

14  substantive count, if that's what you are inquiring of.

15          MR. FLOOD:  I don't think it is ironic as much it is

16  travesty I think.

17          THE COURT:  Well, that may be all of what the

18  Sentencing Guidelines are but that's what they are.

19          MR. FLOOD:  I understand, Your Honor.   But the

20  question I have and the reason why I submitted the multiple

21  conspiracy request is because if, for instance, Mr. --

22          THE COURT:  Well, in effect, you got the multiple

23  conspiracy charge again.

24          MR. FLOOD:  If they were --

25          THE COURT:  They can only find him guilty of a

1  conspiracy alleged in the indictment, and that's what multiple

2  conspiracies really make reference to.  And they have already

3  been charged with that.

4        But with respect to your inquiry, that's the effect

5  of it.   They can find a person guilty of a conspiracy and not

6  find him guilty of substantive counts, and under the

7  Sentencing Guidelines -- this Court has already determined

8  relevant conduct -- the consequences would be worse under the

9  conspiracy laws for drugs.   Because, remember, the conspiracy

10  laws for other matters don't have the same effect.   You

11  understand that.

12        MR. FLOOD:  I understand.   I guess what I would be

13  asking the Court to do at that point is to reconsider its

14  calculations only in light of the jury's decisions.

15        THE COURT:  No.   No.

16        MR. FLOOD:  The question I have is  --

17        THE COURT:  I don't have any other evidence.  And the

18  standard for sentencing is not the standard for finding a

19  person guilty.   The standard for a sentencing proceeding is

20  altogether different than the standard for a finding of guilty

21  or not guilty.   That's something else.   But those changes

22  took place, I believe, in 1984 when conspiracy for drugs laws

23  no longer imposed a minimum of --  a maximum of five years.

24  That's my recollection.

25        Am I right about that?  Or about that time, anyway.

1       MR. LEWIS:  Mid-'80s, Judge.   I think the Court is

2  right.   Substantial changes occurred.

3       THE COURT:  That's just the way it works.   Because

4  relevant conduct is the one that determines when a person is

5  found guilty of a conspiracy.

6       But, gentlemen, their inquiry means nothing.   What

7  it does mean, however, is that we have a jury that is

8  genuinely and honestly looking into the issues and we should

9  expect no more.   We should not read anything else into it.

10      MR. FLOOD:  Thank you, Your Honor.

11      THE COURT:  We will be in recess.   I simply don't

12  fault them for not understanding.

13      MR. FLOOD:  I am not faulting them, Judge.

14

15      [PROCEEDINGS ADJOURNED]

16

17

18

19

20

21

22

23

24

25

# AFFIDAVIT

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF JEFFERSON | § |

BEFORE ME, the undersigned authority, on this day personally appeared ROY EDWARD CANTU, who, after being by me first duly sworn, on his oath deposed and said:

My name is Roy Edward Cantu and I am competent to make this affidavit. I make it freely and voluntarily with no threat of coercion or duress.

I was a witness for the United States before a duly empaneled grand jury in the Southern District of Texas, Brownsville Division, on January 8, 1997. Prior to my appearance before the grand jury which indicted Javier Lopez Cantu in Cause No. B-97-CR-20, I had numerous meetings with Drug Enforcement Agency Special Agent Steven Hooten, FBI Agent John Wood, and Assistant United States Attorney Charles Lewis. During these interviews I was threatened that if I failed to "play ball", that is, implicate my brother, Javier Lopez Cantu, in my narcotics trafficking activities, then I would be charged. I repeatedly informed the agents and Mr. Lewis that Javier Lopez Cantu was not involved in my drug trafficking activities, but after repeated threats I agreed to appear before the grand jury on January 8, 1997.

A review of the transcript of that grand jury testimony reveals that on numerous occasions I failed to tell the truth to the grand jurors who indicted Javier Lopez Cantu. Specifically, I lied about my brother's involvement in my illegal marijuana trafficking activities in the 1980s. I further lied about my brother being the leader of a drug trafficking organization involving Jerry Lamar, Earl Wilson, Fabian Cavazos, Richard Russell, Rusty Blackwell, Sam Anorga, Rene Lopez, Bill Marsh, John Wester, Sylvia Rosenbaum, Pancho Zaleta, and numerous others. I testified under oath to the members of the grand jury that my brother was involved in narcotics trafficking and money laundering in the 1980s and 1990s. All of my testimony regarding my brother's involvement was untrue, and at the time the testimony was given to the grand jury I believed that Assistant U.S. Attorney Charles Lewis and other members of the United States Government knew that my testimony was not true.

Initials

Affidavit - Page 1 of 2 Pages

After my brother was indicted, I was asked by AUSA Lewis to testify as a witness for the government; however, I refused through my attorney stating that I could no longer continue lying to people about my brother's involvement as I had under oath before the grand jury.



ROY EDWARD CANTU

STATE OF TEXAS
COUNTY OF JEFFERSON

SUBSCRIBED AND SWORN TO before me on September 29, 2000

Notary Public in and for The State of Texas
My commission expires_____

LORRIA LEE PALMIERI
Notary Public, State of Texas
My Commission Expires
FEBRUARY 4, 2003

Affidavit - Page 2 of 2 Pages

Where Richard?

RICHARD:
WHEN I LOOKED AT THE PICTURES
THEY WERE STICKING TOGETHER.
WHEN I SAW #5 IT LOOKED
VERY FAMILIAR BUT MUSTACH +
GOLD CHAIN LOOKED ODD.
I WENT BACK THROUGH AND
FOUND #2. I AM POSITIVE
THIS PERSON BASICLY RAN OPERATIONS
AT HOUSE. AS I TOLD YOU I BELEIVED
THIS PERSON TO BE JAVIER'S BROTHER.
BECAUSE HE WOULD SAY HE HAD TO
CALL JAVIER AND FIND OUT AMOUNT TO
BE SENT WITH ME. THE FIRST TIME
I SAW HIM WAS EARLY LAST SOMMER
HE WAS THERE AT HOUSE ALMOST EVERY
TRIP. PROBABLY 5 or 6 TRIPS, HE ALSO
WOULD MAKE A CALL TO SOMEONE
AND TELL THEM WHAT TO BRING TO SEND
WITH ME. PICTURE #5 IS EITHER
OLDER PICTURE OF HIM OR A BROTHER
THAT LOOKS JUST LIKE HIM.
PICTURE #2 IS PERSON I THOUGHT
TO BE FABIAN CANTU.
WHEN CAVASOS WAS THERE HE
WOULD GET ORDERS FROM PICTURE #2

As FAR As I Know Pic #2 Lived
At House Along With Cavasos.
    Cavasos Became Involved About
The Same Time I Met Pic #2.
He (Cavasos) was Involved In Delivery
To Me Approx 5-6 Times.
    Pic #2 Never Actually Touched
Any Load.

    I Also Found Gerry Lamar's
Mailing Address   It Was Given
To Me As   P.o. Box 35245
            Sarasota, Fl, 34242
The Marina Where He Was Keeping
His Sailboat Was On South Shore Of
Tampa Bay In Town Of Ruskin Fl.
The Marina Was Pretty Small With
Mostly Sailboats In It.

    Other Pictures Do Not Look
Familiar.

            Hope This Helps
            Mark Miller



#2



#4

Little Joe

#3



#1

1  A    Yes.

2           MR. LEWIS:   Thank you.   We pass the witness, Judge.

3           THE COURT:   Your witness, sir.

4           MR. FLOOD:   Thank you, Your Honor.

5

6

7                        CROSS-EXAMINATION

8

9  BY MR. FLOOD:

10  Q   Mr. Miller, my name is Chris Flood.   We have never met,

11  have we?

12  A   No, we have not.

13  Q   I want to direct your attention to I think the most

14  important part of your testimony and that is this identity

15  issue.

16          When you first began cooperating or told the police

17  about your involvement in narcotics trafficking, that was to a

18  man by the name of Richard Brazzil, is that right?

19  A   I am not sure if it is the correct pronouncement of his

20  last name.   But, yes.

21  Q   But he is a DPS investigator, Brazzil.   Brazzil, is that

22  the way you pronounce his name?

23  A   I believe so, yes.

24  Q   DPS investigator.

25  A   Yes.

1  Q    DPS meaning Department of Public Safety?

2  A    Yes.

3  Q    And he interviewed you about all these trips that you made

4  to this address in Houston?

5  A    Yes.

6  Q    At that time he didn't have any photographs of any

7  individuals, is that right?

8  A    Not when he first interviewed me, no.

9  Q    So he sent you some photographs in the mail?

10  A    Yes.

11  Q    Did he give you instructions as to what you were supposed

12  to do with those photographs?

13  A    Just to look at them and, if I recognized anyone in the

14  photographs, to indicate so and send them back to him.

15  Q    In a letter or by phone call?  How were you supposed to

16  indicate?

17  A    He sent me the self-addressed envelope, told me to send

18  the pictures back, and either write on the back or write a

19  letter and use the numbers on the backs of the photographs to

20  -- as far as the recognition of the photographs.

21         MR. FLOOD:  May I approach the witness, Your Honor?

22         THE COURT:  You may.

23  BY MR. FLOOD:

24  Q    Do you have his letter?  Produce the letter he wrote to

25  you?

1    A    I don't know that.

2    Q    These numbers on these photographs, are these the same

3    numbers that were on them when you received it?

4    A    Yes.

5    Q    Okay.   Now, you, in turn, wrote him back, isn't that

6    correct?

7    A    Yes, I did.

8    Q    Excuse me.   And your first comment to him was, "When I

9    looked at the pictures, they were sticking together," isn't

10   that right?

11   A    One picture was --  was just -- I quickly glanced through

12   them and one picture did not -- it was like a deck of cards.

13   It wasn't clearly visible at that moment.   I went through

14   them a second time --

15   Q    So --

16   A    -- and saw them.   Because I saw the numbers on the back,

17   that there were five, and so I looked for the fifth picture

18   because I only saw four the first -- first time I looked at

19   them.

20   Q    That's why in your letter to him, you say, "When I looked

21   at the pictures they were first sticking together"?

22   A    Yes.

23   Q    Then you went through them again, right?

24   A    Yes.

25   Q    And you said that the individual on Picture Number 5

1    looked familiar; right?

2    A    Yes, I did.

3    Q    You then went and stated that the picture -- the person

4    depicted in Picture Number 2 was the individual that ran

5    operations at the house, right?

6    A    Yes.

7    Q    And that because of the prior conversations you had with

8    Jerry Lamar and the rest of the people in these ten or 12

9    trips you made, the person that ran the house was Javier's

10   brother, right?

11   A    I don't believe that is the wording in the -- that I put

12   in the letter, no.

13   Q    Well, did you state in the letter, "As I told you -- I am

14   positive this person basically ran operations at the house.

15   As I told you, I believe this person to be Javier's brother"?

16   Is that in the letter?

17   A    I didn't know that unless I read the here.

18            MR. FLOOD:   May I approach the witness, Your Honor?

19            THE COURT:   Yes.

20            MR. FLOOD:   Your Honor, I would move for the

21   introduction of Government's Exhibit Number 119.   That is the

22   letter.

23            THE COURT:   Any objection.

24            MR. LEWIS:   We would like to have both of them in,

25   Judge.

1          MR. FLOOD:  If he wants to move to have that in,

2    there may be some objections at that time, Your Honor, but I

3    would like to have the handwritten letter of this witness.

4          THE COURT:  Any objection to 119?

5          MR. LEWIS:  It is incomplete without 119-A.

6          THE COURT:  Any objection to 119?

7          MR. LEWIS:  Only as stated, Judge.   No further

8    objection.

9          THE COURT:  119, being that of the defendant -- of

10   the witness will be admitted into evidence.

11         Do you wish to submit 119-A?

12         MR. LEWIS:  We do.

13         THE COURT:  Any objection?

14         MR. FLOOD:  Yes, Your Honor.

15         THE COURT:  What grounds?

16         MR. FLOOD:  Your Honor, --

17         THE COURT:  Are those the pictures that were sent to

18   you that you viewed, sir?

19         THE WITNESS:  They appear to be, yes.

20         THE COURT:  All right.   119-A will be admitted into

21   evidence.   You may proceed.

22

23

24     (Whereupon, Government's Exhibit Numbers 119 and 119-A

25   were received into evidence.)

1

2  BY MR. FLOOD:

3  Q   Showing you what has been admitted as 119 now, that is the

4  letter you wrote to Mr. Brazzil?

5  A   Yes.

6  Q   Do you see starting at -- second paragraph of your letter,

7  -- by the way, this was -- what date was it that you sent

8  this to Officer Brazzil?  Do you recall?

9  A   It would have been during the summer of '95.   Probably

10  late June or July.   I don't know the exact date.

11  Q   Okay.   And in the second paragraph of your letter to

12  Officer or Sergeant Brazzil, before you knew that Javier Cantu

13  was going to be on trial, you stated that the individual on

14  Picture Number 2 is the person who ran operations at the

15  house, right?

16  A   Yes.

17  Q   You said, "As I told you, I believe this person to be

18  Javier's brother."

19  A   That's what written, yes.

20  Q   Well, you wrote it, right?

21  A   Yes.

22  Q   Apparently you are making reference to a previous

23  conversation with Officer Brazzil, where you told Officer

24  Brazzil that Javier's brother was the person who ran

25  operations at the house, correct?

1  A    I don't recall the conversation.    I --

2  Q    Well --

3  A    I don't -- it appears as though I had conversation with

4  Detective Brazzil before this letter, yes.

5  Q    Right.    Let's make sure we understand the sequence of

6  events.    You had a conversation with Officer Brazzil, right?

7  A    Yes.

8  Q    He then gave -- sent you some pictures in the mail and

9  said, "Tell me if you know any of these people and write me

10  back and let me know," isn't that right?

11  A    Yes.

12  Q    And then you sent this letter, Government's Exhibit Number

13  119, along with the pictures back, right?

14  A    Yes.

15  Q    And in that letter, you said that the individual in these

16  pictures -- by the way, these aren't very good pictures, are

17  they?

18  A    No, they are not.

19  Q    Very difficult to tell who is who, right?    Would you agree

20  with me?

21  A    They are not very good pictures, yes.

22  Q    Well, in fact, later on you say that Picture Number 5 is

23  either another picture of the person in Number 2 or a brother

24  who looks like him, is that right?

25  A    As I recall, when I wrote the letter, that is correct.

1  Q    In fact, you said Picture 5 is either the same person as

2  in Picture Number 2 or is a brother who looks just like him.

3  A    Correct.    Yes.

4  Q    And Picture Number 2 is the person that you identified as

5  Javier's brother, right?

6  A    Yes.

7  Q    So you know who Javier is at this point?

8  A    No.

9  Q    But Javier's brother was the one who basically ran the

10  operations at the house?

11  A    I didn't know that for a fact, either.

12  Q    Well, that's what you put in your letter, right?

13  A    What I put in the letter and had told Richard Brazzil was

14  that the person introduced to me as Fabian was --  and I was

15  never introduced to him in any other way --  was the person

16  that ran the operations.    That I had heard of Javier as being

17  the leader of their organization, but that I didn't know if I

18  had met him or not.

19  Q    Well, that's in --

20  A    As to the best of my recollection, I was never introduced

21  to a Javier.    I don't --

22  Q    That is in direct contradiction to your own written

23  statement that you told Officer Brazzil that the person that

24  you believed to be Javier's brother ran operations at the

25  house, isn't that right?    Isn't that your written statement?

1  A    That is my written statement.

2  Q    Now, this statement was given before you were made any

3  other deals to testify in this case, right?

4  A    I haven't been made any deals.

5  Q    Have they have told you they wouldn't use your statement

6  against you to charge you with another offense?

7  A    No.

8  Q    Do you expect to be charged for all the other trips and

9  deals that you testified to?

10  A    I am not aware of any indictments pending.

11  Q    I understand that.    But my question is, do you have an

12  agreement with the United States attorneys in this case that

13  if you testified they won't indict you for any of the other

14  trips that you have made reference to?

15  A    I have no agreement.

16  Q    Are you hoping that they don't?

17  A    Yeah, of course I am hoping that they don't.

18  Q    Because you are about to be released through a halfway

19  house, right?

20  A    That is correct.

21  Q    And you don't want to stay in jail, right?

22  A    No.

23  Q    Have they told you that they wouldn't use your testimony

24  or any statements that you told them against you, in a

25  subsequent prosecution?

1  A    No, they haven't.

2  Q    Who is your lawyer?

3  A    I have a public defender.

4  Q    Okay.

5  A    So I have no -- no representation at this time.

6  Q    Well, we got into that discussion before.   Let me get

7  back to the point.   After you stated that the person in the

8  photograph, in the photo list, is the person that you thought

9  to be Javier's brother, you also said that same person would

10 have to call Javier to be -- to find out what amount was to be

11 sent with you, isn't that right?

12 A    That is what he told me, yes.

13 Q    No.   I am talking about your letter to Officer Brazzil.

14 Okay.   The person that you depicted -- I mean that you saw in

15 the photo spread, the person that you thought to be Javier's

16 brother who ran the operations at the house, said he had to

17 call Javier and find out what was to be sent, right?

18 A    That is correct.

19 Q    Right.   You then told Sergeant Brazzil that when Cavazos

20 was there, he would get orders from Picture Number 2, isn't

21 that right?

22 A    Yes.

23 Q    And Cavazos, is he one of the people pictured here?

24 A    No.

25 Q    That was the person you knew as Fabian Cavazos, correct?

1   A   That is correct.

2   Q   You also said that the person who lived at the house was

3   the person that is depicted in Picture Number 2, right?

4   A   That is what I stated in that letter.

5   Q   And that he lived there along with Fabian Cavazos?

6   A   During my trips to the house, that was the apparent

7   arrangement.

8   Q   Now, you met an individual by the name of Little Roy,

9   right?

10  A   That is correct.

11  Q   Did you get a chance to observe him clearly?

12  A   For probably maybe -- owe, it was during the time of the

13  -- of the receipt of the marijuana.   There was maybe a

14  five-minute or ten-minute period that we were both at the

15  house.

16          MR. FLOOD:   May I approach the witness, Your Honor?

17          THE COURT:   You may.

18  BY MR. FLOOD:

19  Q   Does he appear to be depicted anywhere in this

20  photospread, Little Roy?

21  A   I can't say that he is or isn't.   I am not that -- I

22  really couldn't recognize him at this time.

23          THE COURT:   Let me see that spread, sir, that

24  photospread.

25  BY MR. FLOOD:

1  Q   Now, prior to testifying here today, you were interviewed

2  by Sergeant Brazzil, right?

3  A   That is correct.

4  Q   Then you were interviewed by Special Agent John Wood and

5  Drug Enforcement Administration Special Agent Steve Hooten, is

6  that correct?

7  A   I don't recall their names, but I was -- I was interviewed

8  by some -- several people, yes.

9  Q   Do you remember when Special Agent Steve Hooten and John

10 Wood went to interview you at the Federal correctional

11 facility in Terre Haute, Indiana?

12 A   Yes.

13 Q   In May of last year?

14 A   Yes.

15 Q   You remember you told them basically about these loads

16 that you had made for Jerry Lamar?

17 A   Yes.

18 Q   And during that interview, they expressed to you the

19 importance of telling them the truth, the whole truth and

20 nothing but the truth, right?

21 A   Yes.

22 Q   And they, in fact, told you that if you weren't truthful

23 with them, that that in and of itself was a Federal offense?

24 A   Probably.

25 Q   Now, when you met with the agents in April of '96, you

1  testified that the first load in 1994 was in April of 1994,

2  correct?

3  A   I believe so.   I can't be positive.

4  Q   Well --

5  A   To the best of my recollection, yes.

6  Q   Well, you just testified to the best of your recollection

7  that the first load in 1994 was in April of 1994, isn't that

8  true?

9  A   Yes.

10  Q   All right.   And Mr. Lewis has referred to it as the fifth

11  load.   Do you recall that?

12         THE COURT:  Assuming he referred to it as the fifth

13  load, all right, your question is.

14         THE WITNESS:  It was.

15  BY MR. FLOOD:

16  Q   Mr. Lewis referred to the April, 1994, trip that you made

17  to Houston as the fifth load, isn't that right.

18         THE COURT:  Assume that he did.

19  BY MR. FLOOD:

20  Q   Assuming he did?

21  A   Fifth trip, yes.

22  Q   You testified earlier under direct examination that on

23  date you contacted Jerry Lamar, correct?

24  A   He contacted me.

25  Q   Okay.   You met him at McDonald's restaurant in the

1   Houston area?

2   A   Yes.

3   Q   That a person drove up with an amount of marijuana in a

4   vehicle, correct?

5   A   Correct.

6   Q   And that person you later identified as the person by the

7   name of Rudy, is that correct?

8   A   That is correct.

9   Q   Did you tell the agents that the first load in April of

10  1994 actually took place at this location at 39 -- not 3916

11  but 3922 Manitou?

12  A   I don't recall that, no.

13  Q   Have you had an opportunity to refresh your memory from

14  the reports done by the agents of their interview with you in

15  April of 1996?

16  A   Not with any agents.

17          MR. FLOOD:  May I approach the witness, Your Honor?

18          THE COURT:  You may.

19          If the agent says that you said that Trip Number 5

20  was at the Manitou, whatever number it was, would that be

21  correct or not?  If they said you told him that, would that be

22  correct or not?  You remember telling them that?

23          MR. FLOOD:  Judge, there is a lot of discrepancy.

24          THE COURT:  Don't interrupt me, now.

25          You remember that?  Or do you remember?

1      THE WITNESS:  I can remember when the trips are at

2 this time.   What --  I may have been mistaken the time I

3 talked to them.   I am not sure what was told to them, but I

4 know when I went there today.

5      THE COURT:  If they say you said something different

6 than what you told us today, why would there be something

7 different?  Would you know?

8      THE WITNESS:  No, I would not know that.

9      THE COURT:  Well, was it their error or yours?

10     THE WITNESS:  I couldn't tell you that for sure,

11 whose error it may have been.

12     THE COURT:  Well, assuming there's something in that

13 statement they said you made is different than what you told

14 us today, which one would be correct?  What you told us

15 today --

16     THE WITNESS:  Well, what I told you today is correct

17 to the best of my recollection.

18 BY MR. FLOOD:

19 Q   Well, you would agree with me, would you not, Mr. Miller,

20 that when you met with the agents over a year ago, at least

21 that was  --  the events were fresher in your memory then than

22 they are today?

23 A   They should have been at that time.

24 Q   Certainly.

25 A   Yes.

1  Q   And the agents didn't tell you, "Hey, look, just make up

2  some things and we will put it in a report.  And if you

3  testify later, you can testify whatever you want to"?

4  A   No, they didn't tell me anything of the sort.

5  Q   In fact, they told you to be very specific and detailed

6  because this might used against someone in a court of law,

7  isn't that right?

8  A   I would assume that's what they said, yes.

9  Q   Do you recall telling the agents that the first trip, the

10  first load, in April of 1994, that you went to the location at

11  3922 Manitou?

12  A   I didn't give them any addresses.

13  Q   You recall telling them that when you went to that

14  address, you picked up 30 pounds of marijuana and brought it

15  back to the Indiana area?

16  A   I --

17  Q   You want to refresh your memory from the report?

18  A   I don't believe that -- the April trip was in 1994.

19  Marijuana was brought to McDonald's and that's where I got

20  it.

21  Q   That's what you are saying now?

22  A   That is the only -- that is what happened.  I don't know

23  what was put in the reports and why it was put there because I

24  don't believe that I've ever stated any differently.

25  Q   If Special Agent John Wood and Special Agent Stephen

1   Hooten with DEA -- I hope I am saying the name right -- both

2   say that you said back a year ago that the first load you

3   picked up at the Manitou address and there is no mention of

4   Rudy or Rudy bringing a load or Rudy sticking his head in the

5   car, there is no mention of that to you --  of you or by you

6   to them in your initial interview, are you saying they are

7   wrong or were you wrong?

8   A    I am not sure what trip they are referring to, if that --

9   the first time I went to the location to pick up the marijuana

10  and who was there.   It was -- whether that was -- I know that

11  the first trip in '94 the marijuana was brought to me at a

12  McDonald's.  The second trip I went to the house.

13  Q    Are you denying that you told Special Agent Hooten and

14  Special Agent John Wood in an interview in April -- on April

15  24th of 1996 that the first load was picked up by you at 3922

16  Manitou in Houston, Texas?  Are you denying that?

17  A    I may have misunderstood there question, if that's what

18  they asked me.

19  Q    Are you denying that you never mentioned anything about

20  Rudy bringing the marijuana to a McDonald's restaurant in

21  Houston in the April 1994 trip?  Are you denying that?

22  A    Rudy bringing me the marijuana at the McDonald's is what

23  happened in the first trip in 1994.

24  Q    Then why didn't you tell the agents that?

25  A    I think there is a possible discrepancy in the report

1  there because I obviously -- the first trip in 1994 and the

2  first trip I picked up the marijuana at the residence is two

3  separate -- two separate --  first incidences.

4  Q   And you then testified on direct examination that the next

5  trip you made, the sixth trip as Mr. Woods put it, was in July

6  of 1994.   You never told the agents that you went to Houston

7  in July of 1994 and made a trip, did you?

8  A   The trip at that time was the very last couple days of

9  June, the first couple days of July.   But there has never

10  been a discrepancy in that trip as far as I am concerned.

11  Q   Well, in the report back a year ago you told the agents

12  that you made a trip in June of 1994.   It is your testimony

13  now that it was in July 1994, is that your testimony?

14  A   It was the last couple days of June or the first couple

15  days of July.

16  Q   Okay.   And earlier on your direct examination, you did

17  say that you went to the residence on Manitou and that you met

18  with Rudy, correct?

19  A   Yes.

20  Q   And that you were directed to pull into the garage,

21  correct?

22  A   Yes.

23  Q   And that you left or Rudy left and a little while later

24  came back with a car load of marijuana.

25  A   To the best of my recollection, that is what happened on

1  that trip, yes.

2  Q   Is it your testimony, then, that you didn't meet an

3  individual by the name of Fabian in that --  on that trip?

4  A   To the best of my recollection, I did not meet a person

5  that introduced himself as Fabian on that trip, no.

6  Q   A year ago when you met with the agents, did you testify

7  or did you tell them that you met not Fabian but Javier Cantu

8  on that trip?

9  A   No, I don't believe I did.

10 Q   Did you tell them that Javier introduced himself as Fabian

11 on that trip?

12 A   Could you repeat that question, please?

13 Q   You had an interview with the agents about a year ago,

14 correct?

15 A   Correct.

16 Q   And in that interview you make no mention of a July trip

17 but you made mention of a June trip, isn't that right?

18 A   The trip in question, close as I can put it to a date is

19 that I was home before the Fourth of July.

20 Q   And in that meeting with the agents, you stated that there

21 was a 30-pound shipment from Houston that you were supposed to

22 pick up, correct?

23 A   I believe so, yes.

24 Q   But you make no mention in that trip or in that meeting

25 with the agents of Rudy again, isn't that right?

Case 1:00-cv-00154   Document 1   Filed in TXSD on 10/04/2000   Page 103 of 121

1    A    I don't know what questions were asked.

2    Q    And did you not also tell the agents that is when you met

3    Javier Cantu?  You want to refresh your memory from the report

4    by Special Agent Hooten, gentleman seated here?

5    A    Sure.

6    Q    Refer you to Item Four and take a minute and read that.

7    Have you had a chance to review Item Four in Special Agent

8    Hooten's report?

9    A    Yes, I have.

10   Q    All right.   Again, this interview with Special Agent

11   Hooten that was where you were supposed to tell the whole

12   truth, right?

13   A    Yes.

14   Q    And in that meeting that took place a year ago, you told

15   Special Agent Hooten that you arrived at the house and met

16   Javier Cantu, didn't you?

17   A    That's what that statement states, yes.

18   Q    Are you saying that you never said that to Special Agent

19   Hooten?

20   A    As I've indicated to all the agents, I've never been

21   introduced to Javier Cantu as per having known his name.   I

22   was not presented to any individual that introduced himself to

23   me as Javier.

24   Q    So why would you tell Special Agent Hooten that you meet

25   Javier Cantu in June of 1994?

1    A    I don't believe that was what my statement was.

2    Q    Again, it is the agents' fault, is that your testimony?

3         THE COURT:  Well, yes or no?

4    A    I guess the answer is yes.

5    BY MR. FLOOD:

6    Q    Is it also their fault not including Rudy or any of this

7    testimony that you are now giving that Rudy left with the

8    vehicle and came back with marijuana?  Is it your testimony

9    that you told them that on that occasion a year ago but now

10   they have just fortuitously left it out?

11   A    I don't know what questions were asked me that date.

12   Q    You don't recall what you told the agents on that date?

13   A    No, I don't recall what I told them one year ago

14   exactly.

15   Q    So I guess your testimony is, you could have told them a

16   year ago --  that you could have said that Rudy had nothing to

17   do with it and that you met Javier Cantu?

18   A    No, I couldn't have told them that.

19   Q    Now, did you state that in August of 1994 -- did you

20   testify on direct testimony that in August of 1994 you made

21   another trip?

22   A    Yes, I did.

23   Q    And my notes are kind of sketchy on this.   What happened

24   on the August 1994 trip?

25   A    That was the trip that I --  when I arrived there was an

1   individual waiting in the screen porch that introduced himself

2   as Fabian.

3   Q    Okay.   And then what happened?

4   A    He made some phone calls and marijuana was brought to the

5   location.

6   Q    Is this the person that you now recall as being the one

7   who ran the operations at the house?

8   A    It is the defendant that was there at that time.

9   Q    He is the person that you are now saying is the person who

10   ran the operations at the house?

11   A    He appeared to run the operations at the house.

12   Q    You met that person in August of 1994?

13   A    To the best of my recollection, yes.

14   Q    You recall your interview with the agents a year ago, that

15   you told the agents that in August of 1994 you met Roy Cantu,

16   the brother?

17   A    He may have been there at that time.   I don't recall

18   exactly who was at those --   that is nearly three years ago

19   and exactly who was there on which dates are kind of sketchy.

20   Q    Isn't it true that a year ago when you met with the

21   agents, you didn't mention anything to them about meeting this

22   person Fabian that you now identify as Javier Cantu?   You

23   never mentioned anything about meeting Fabian on that date or

24   Fabian having anything to do with organizing the load of

25   marijuana, isn't that right?

1   A   I don't know what is stated in the statements.

2           MR. FLOOD:   May I approach the witness again, Your

3   Honor?

4           THE COURT:   You may.

5   BY MR. FLOOD:

6   Q   Let me refer you to both reports.   Agent Hooten's, Item

7   Five, August of 1994, and the first page of Special Agent John

8   Wood with the FBI's report, where he talks about the third

9   load in August of 1994.   Review that and then this right

10  here.   Have you had enough time to review that?

11  A   Yes.

12  Q   It is true, is it not, that when you were supposed to be

13  telling the agents the whole truth, that you never mentioned

14  meeting this person Fabian in August of 1994, isn't that

15  right?

16  A   The interview a year ago was a very short interview.

17  There was no extended conversations about any of the trips.

18  Q   Well, the agents wrote at least in their report what you

19  told them about those trips, right?

20  A   Yes.

21  Q   And that meeting that you had a year ago you said to

22  Special Agent Hooten that in August of 1994 you went to the

23  address in Houston, you picked up approximately 30 pounds of

24  marijuana, that when you arrived at the location you met Roy

25  Cantu and that Fabian Cavazos and Roy Cantu gave you the 30

1  pounds of marijuana, isn't that right?

2  A    The times I -- that Roy was at the residence, person

3  introduced to me as Roy, he had very little involvement in any

4  actual transaction of anything.

5  Q    Did you say that to the agents a year ago or not?

6  A    That's what's in the statement.

7  Q    Are you saying the statement is wrong and the agents are

8  wrong?

9  A    I don't know what was asked at that time and what they

10  wrote down at that time.   I know what I -- I know what I know

11  and I never indicated that the person introduced to me as Roy

12  had more involvement than being at that location.

13  Q    Well, what you know is what I am asking you about

14  Mr. Miller.

15  A    Yes.

16  Q    Back a year ago, did you know that in August of 1994 you

17  met Roy and there was no mention of meeting this person named

18  Fabian?  Is that what you knew then?

19  A    The person that was arrested with me named Fabian was

20  present at that delivery in 1994.

21  Q    Why didn't you tell --

22  A    I wasn't introduced to him until at a later date.

23  Q    Why didn't you tell the agents that a year ago?

24  A    That question may not have been asked.

25  Q    Well, didn't they ask you who was there at the time you

1  picked up the load?

2  A    They asked me very few questions at that interview one

3  year ago, '96.

4  Q    My question is, did they ask you who was there at the

5  house when you picked up the load?

6  A    I can't tell you if they asked me that question or not.

7  Q    Nevertheless, you told them back a year ago that Roy Cantu

8  was there and that you met Roy Cantu, right?

9  A    I met a person named Roy.

10 Q    Are you now suggesting that this Roy person had another

11 name, too?

12 A    No.   The only reason I know his name is Cantu is because

13 he was arrested with me.   Up till that time I didn't know his

14 last name.   He was Roy.

15 Q    Now, according to Mr. Lewis, there was an eighth trip in

16 October of 1994.   That's what you testified to in your direct

17 examination, isn't that correct?

18 A    Yes.

19 Q    Did you testify in your direct examination that in October

20 of 1994 during the eighth trip the only person you had met to

21 that point was Rudy?

22 A    That may be.

23 Q    All right.   So you testified to that earlier today, that

24 on your eighth trip in October 1994, the only person you had

25 met up to that point was Rudy.   That's what you testify to

1  earlier?

2  A   Yes.

3  Q   That's not what you told the agents, though, was it?

4  A   No.

5  Q   In fact, that's not what you are testifying to now.   Now

6  you are testifying that you might have met Roy on a previous

7  occasion, is that it?

8  A   The exact dates that I met certain individuals, I am not

9  positive of.

10  Q   Will you agree with me that you are not real positive of a

11  lot of things dealing with this time period?  Would you agree

12  with me on that?

13  A   In 1994 the only thing I can give you is approximate dates

14  of the trips that were made.

15  Q   I am not talking about the dates.   I am talking about,

16  would you agree with me that you are not real positive about

17  who some of these people or when you met them or who was in

18  charge or who was getting dope?  Would you agree with me on

19  that?

20  A   I know which individuals are going to pick up the

21  marijuana.

22  Q   Have you been released since your arrest in April of

23  1995?

24  A   Released?

25  Q   Yes.   Released out of jail.

1  A   Was I released on bond?

2  Q   Yes.

3  A   Yes, I was.

4  Q   Isn't it a fact that when you first were interviewed in

5  April of 1995 -- I am not even talking about this interview

6  in '96 -- you told Sergeant Brazzil that you don't think you

7  had ever met Javier Cantu?

8  A   I didn't know if I had met him or not.  I was never

9  introduced to him.

10 Q   And yet one year later on April 24, 1996, before

11 testifying here today, you told Special Agent Hooten that you

12 met Javier Cantu in June of 1994.

13 A   That's what that statement says.

14        THE COURT:  How did you know who Javier Cantu was?

15        THE WITNESS:  I don't.

16        THE COURT:  Beg your pardon?

17        THE WITNESS:  I don't know who Javier Cantu is.

18        THE COURT:  Why did you continue to make reference to

19 Javier Cantu?  Was it because the officers were giving you

20 that name?

21        THE WITNESS:  I don't recall what questions or

22 answers were at that time.   What statements may have been

23 made to me about who was there.

24        THE COURT:  My question --  let's go back to this.

25 Why do you keep making statements to the effect about a

1    Javier?  Who is Javier?

2            THE WITNESS:  I was never introduced to Javier.  I

3    don't have other than --

4            THE COURT:  Earlier in your testimony you said that

5    man right there, the defendant in this case, was presented to

6    you by the name of --

7            THE WITNESS:  Fabian.

8            THE COURT:  -- Fabian.  All right.  Now, to this

9    date, has -- do you have any information that he is not that

10   same person that you stated that you saw on the date in

11   question and on the other events or dates in question?  Is

12   that the same person?

13           THE WITNESS:  That is the same person.

14           THE COURT:  Is that the person that you know by the

15   name of Fabian?  Fabian?

16           THE WITNESS:  Yes.

17           THE COURT:  Who told you that he was Javier?

18           THE WITNESS:  I don't recall if anyone told me that

19   he was Javier.

20           THE COURT:  Why is it that in making statements you

21   made reference to a Javier?  Did the officers tell you that

22   there was a Javier?

23           THE WITNESS:  To -- as I recall, to the best of my

24   recollection, the DEA and the prosecution of my case made a

25   reference to Javier Cantu.  That's the only recollection I

1    can have at this time.

2            THE COURT:  Well, as he sits there, do you know who

3    he is.

4            THE WITNESS:  No, I do not.

5            THE COURT:  But is he the same person that you

6    identified as having come into contact with on the occasions

7    in question?

8            THE WITNESS:  Yes, he is.

9            THE COURT:  You don't know who he is?

10           THE WITNESS:  I do not know who he is.

11           THE COURT:  Well, then, would you explain why you

12   would make reference to a Javier if you didn't know who he

13   was?  Was this because people in law enforcement were making

14   reference to Javier?

15           THE WITNESS:  The only person that I can recall

16   making any reference to Javier is the DA in Beaumont.

17           THE COURT:  Well, then, why would Javier's name be in

18   those statements that you made about a year ago to the

19   officers?

20           THE WITNESS:  I don't know that.

21           THE COURT:  Were you the one who brought up the name

22   Javier or were they?

23           THE WITNESS:  I don't know.

24   BY MR. FLOOD:

25   Q   Is it your testimony now that the first time you ever

1   heard Javier was from the DA's mouth?

2   A    The name of Javier was given to me by Jerry Lamar in

3   various conversations with him --  from the time I met

4   Jerry.   And he is the only person that , actual person

5   involved -- there were other references made by Terry that

6   Javier would call him.   But there are no -- I was never

7   introduced to --  officially introduced to anyone named

8   Javier.   I do not have any prior knowledge of who Javier is

9   other than was told that he ran the operation.

10  BY MR. FLOOD:

11  Q    And this is --  so now it is your testimony that the DA,

12  Jerry Lamar and Terry Crump are the ones that have used the

13  term Javier?

14  A    The DA used Javier at -- he interviewed me like at my

15  sentencing or somewhere in that vicinity of time.   I am not

16  exactly sure what that time period was, but that's when he

17  used Javier.

18  Q    Do you have a hard time understanding my questions?

19  Because my question was, the DA, Jerry Lamar and Terry Crump,

20  those are the only three people that you ever heard use the

21  term Javier?

22  A    The defendant used the term Javier.

23  Q    Okay.   This individual used the word Javier?

24  A    That he would have to call Javier.

25  Q    Now, are you familiar --  well, you say you met an

1    individual by the name of Roy?

2    A    Yes.

3    Q    Does Roy look similar to Javier?

4    A    Slightly similar.

5    Q    He is a brother?

6    A    He appears to be a brother, yes.

7    Q    And back two years ago, before you got confused when -- in

8    your statement a year ago, you said that the person who ran

9    operations at the house was Javier's brother, right?

10   A    That's in that statement, yes.

11   Q    Well, it is in your statement?

12   A    Yes.

13   Q    Now, let's go back.  I think in direct testimony you said

14   that in November of 1994 Jerry Lamar asked you to take

15   marijuana to Terry Crump, is that correct?

16   A    An individual named Terry.

17   Q    An individual named Terry in Arkansas?

18   A    That is correct.

19   Q    Do you recall being again interviewed by the agents a year

20   ago, April 29th of 1996?

21   A    Yes.

22   Q    And again were you told to tell them the whole truth and

23   not just make something up?

24   A    Yes.

25   Q    Did you tell the agents a year ago that Javier Cantu asked

1    Miller to ask you to take marijuana to Arkansas, to a man by

2    the name of Terry?

3    A    Jerry Lamar always made arrangements with me for any

4    trips.

5            MR. FLOOD:  May I approach the witness, Your Honor?

6            THE COURT:  You may.

7    BY MR. FLOOD:

8    Q    I am going to show you again the report of interview done

9    by Special Agent Steven Hooten with the Drug Enforcement

10   Agency and Special Agent John Henry Wood IIII of the FBI.  And

11   I am going to refer your attention to Item 7 on Page 2 of

12   Agent Hooten's report and ask to you read that.   Just review

13   it.   And then I will refer you to Paragraph 4 of Agent Wood's

14   report.

15           Have you had sufficient time to review those two

16   paragraphs?

17   A    Yes.

18   Q    It is true, is it not, that you told the agents a year ago

19   that Javier Cantu was the one who told you to deliver

20   marijuana to a Terry in Arkansas in November of 1994?

21   A    I believe what I stated to the agent was the pictures that

22   --  the person I identified in the pictures that were sent to

23   me is the person that --  when I arrived at the residence also

24   asked me whether or not Jerry Lamar had arranged for me to

25   deliver the marijuana to Arkansas, which I replied, yes, that

1  he did.

2  Q   Is that now your testimony?

3  A   I am explaining to you how that situation arrived.

4  Q   Well, you testified on direct testimony under oath to this

5  jury that Jerry Lamar told you to take the marijuana to an

6  individual by the name of Terry in Arkansas, isn't that

7  right?

8  A   Yes, he did.

9  Q   You never told the agents that a year ago, did you?

10 A   That is not in the statement, no.

11 Q   Apart from what's in the statement, you never told the

12 agents that Jerry Lamar told you to take marijuana to Terry in

13 Arkansas in this November of 1994, isn't that right?

14 A   That is not what is written in the statement, no, it is

15 not.

16 Q   Don't you think that is the kind of an important thing a

17 good agent will do, is write down what you tell them?

18         THE COURT:  Well, is what's written in the statement

19 what you told them or is what's written in the statement what

20 they wrote?

21         THE WITNESS:  That's what they have written down that

22 they heard me say, obviously.

23         THE COURT:  Well, my question was, did you tell them

24 what's written in those statements or is this something that

25 they wrote themselves?  That is my question?  You've read the

1  statements, haven't you?

2           THE WITNESS:  Yes, I have read the statements now.

3           THE COURT:  Is what's written in there what you told

4  them or is that -- or are there things in there that they

5  wrote themselves?

6           THE WITNESS:  What appears to be in the statement is

7  not what  --  not exactly what I would have told them.

8           THE COURT:  All right.

9  BY MR. FLOOD:

10  Q   Well, you testified earlier on direct examination, that in

11  November of 1994 Roy was there at the house, Rudy was there at

12  the house, Fabian was there at the house and some other

13  Hispanic male was there at the house, correct?

14  A   I believe that is correct.

15  Q   You never told the agents that in your meeting a year ago,

16  did you?

17  A   Again, I don't know what is in the statement.

18  Q   You want to review it again?

19  A   Because I know who was there at that November meeting.

20          MR. FLOOD:  May I approach the witness again, Your

21  Honor?

22          THE COURT:  You may.

23  BY MR. FLOOD:

24  Q   Let me show you again the two reports by the competent

25  agents.   Making reference to their interview with you a year

1  ago about what you said happened in November of 1994.   And I

2  want to ask you a specific question:

3       Did you tell the agents that Roy was there, Rudy was

4  there, an individual by the name of Fabian and another

5  Hispanic male?

6  A   The fourth Hispanic was introduced to me as Little Roy.

7  Q   Did you mention that in your interview with the agents,

8  that in November of 1994 Little Roy was there at the house?

9  A   That is not in the statement, no.

10  Q   It is not in the reports?

11  A   It is not in the reports.

12  Q   Do you know of any reason why the agents would refuse to

13  put that type of information in their report?

14  A   No.

15  Q   Is it your testimony that you told the agents a year ago

16  that Roy, Rudy, Fabian and another Hispanic male later -- now

17  it is your testimony -- later identified as Little Roy were

18  there at house in November of 1994?

19  A   I would think that I would have told them that.   No,

20  Little Roy was not there in November of 1994. I am mistaken.

21  That was my --  I am wrong on that.   I had not met Little Roy

22  at that time.

23  Q   You just get --

24  A   You confuse me and I am -- I am incorrect.   Little Roy

25  was not there at that meeting.

1  Q   Isn't it true that throughout all the meetings with the

2  agents, you never said that you met a second Fabian?

3  A   I don't know if I stated that or not, but I had met a

4  second Fabian.

5  Q   Well, you just testified on direct testimony that the last

6  trip in April of 1995 you met another Fabian.  Wasn't that

7  your direct testimony?

8  A   I had met Fabian  --  the second Fabian on a previous

9  trip -- which trip that was, I don't know -- when he

10  introduced himself as Fabian.

11  Q   You never testified to that earlier on direct testimony,

12  though, did you?

13  A   I stated that Fabian had introduced himself to me on a

14  previous occasion.

15  Q   Isn't it true, though, that in all your statements that

16  you gave both to Brazzil and to Agent Hooten and Agent Wood,

17  prior to testifying here today, you never stated that you met

18  a second Fabian?  Isn't that right?

19  A   I don't know.

20  Q   You want to review the report again?

21        THE COURT:  Well, let's assume that they are not in

22  those reports.  If they are not in those trips, then you never

23  said that.

24        THE WITNESS:  I may not have said that.

25        THE COURT:  Assuming that they are not in those

1    reports, would you agree with that?

2                THE WITNESS:  Yes, sir.

3    BY MR. FLOOD:

4    Q    And you were arrested with Fabian Cavazos in April of '95,

5    weren't you?

6    A    Yes.

7    Q    And never mentioned meeting another Fabian to the agents?

8                MR. LEWIS:  Your Honor, please, it is in the report,

9    that he did know and meet another Fabian.

10               THE COURT:  The objection is overruled.

11   A    What was the question?

12   BY MR. FLOOD:

13   Q    You were arrested with a Fabian Cavazos in April of 1995,

14   correct?

15   A    Correct.

16   Q    You never mentioned meeting a second Fabian in any of the

17   interviews that you had with the agents?

18               MR. LEWIS:  Objection.   Misstates the report.

19               THE COURT:  You are going to get him on redirect.

20   We will stay here until we finish with this witness today.

21               THE WITNESS:  I am sure I told them that there was

22   another person by the name of Fabian that I had been

23   introduced to.

24   BY MR. FLOOD:

25   Q    My question is, did you ever tell the agents "I met a

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF TEXAS

### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | )( | |
| | )( | |
| VS. | )( | CRIMINAL NO. B-97-CR-20 |
| | )( | |
| JAVIER LOPEZ CANTU | )( | |

## ORDER

UPON PRESENTATION AND HEARING of Defendant's Motion under 28 USC § 2255

to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody, it is –

ORDERED that Movant's judgment is vacated.

SIGNED at Brownsville, Texas, on _____, 2000.


_____
HON. FILEMON B. VELA
UNITED STATES DISTRICT JUDGE