Case 1:00-cv-00154    Document 4    Filed in TXSD on 02/02/2001    Page 1 of 51

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

FEB 0 2 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| JAVIER LOPEZ CANTU, | § | |
| Petitioner, | § | |
| | § | CIVIL ACTION NO. B-00-154 |
| v. | § | CRIMINAL NO. B-97-020 |
| UNITED STATES OF AMERICA, | § | |
| Respondent. | § | |

## UNITED STATES' ANSWER
## TO MOTION TO VACATE UNDER §2255 AND BRIEF

The United States of America, by the United States Attorney for the Southern

District of Texas, files this Answer to Motion to Vacate Pursuant to Section 2255 and

Brief.

### JURISDICTION

This court has jurisdiction over the subject matter and the parties pursuant to

28 U.S.C. § 2255.

### DENIAL

The United States denies each and every allegation of fact made by Petitioner

("Cantu"), except those supported by the record and those specifically admitted

herein, and demands strict proof thereof.

CutePDF - www.festo.com

## ALLEGATIONS

Cantu makes the following allegations in support of his motion to vacate sentence:

1.  His 360 month sentence was not authorized because the jury was not instructed pursuant to the Supreme Court's decision in *Apprendi v. New Jersey.*

2.  This court's jury instructions impermissibly shifted the burden of proof.

3.  The indictment was based, in part, on perjured testimony.

4.  The pretrial identification of him by witness Mark Miller was tainted by on an impermissibly suggestive procedure.

5.  The United States violated *Brady v. Maryland* by withholding exculpatory evidence.

### IV.
### ANSWER AND BRIEF

### Statement of the Case

Cantu was indicted on February 3, 1997, in the United States District Court for the Southern District of Texas, Brownsville Division, Criminal No. B-97-20, for conspiring to possess 1000 kilograms or more of marihuana with intent to distribute (count 1), for possessing multi-kilogram quantities of marihuana with intent to distribute (counts 2-8) and for conspiring to launder drug proceeds (count 9) in violation of 18 U.S.C. §§ 2 and 1956(h) and 21 U.S.C. §§ 841(a), 841(b)(1)(B), 841(b)(1)(D) and 846 (Doc.1,pp.1-16).   The indictment also gave notice of the

United States' intent to forfeit property pursuant to 21 U.S.C. § 853 (Doc.1,pp.11-16).
The case proceeded to trial and Cantu was convicted of the conspiracy charges and
acquitted of the substantive counts (Docs.64,712). The jury also entered a verdict of
forfeiture as to 11 properties listed in the indictment (Doc.73).

This court sentenced Cantu to concurrent terms of 360 months confinement on
count one and 20 years confinement on count nine (Doc.123). It also ordered Cantu
to serve concurrently a five year and a three year term of supervised release, to pay
a $20,000 fine and a $200 special assessment (Doc.123). Cantu appealed his
conviction and it was affirmed in a published opinion *United States v. Cantu*, 167
F.3d 198 (5th Cir. 1999). His petition for writ of certiorari was denied on October 4,
1999). *Lopez Cantu v. United States*, 528 U.S. 818, 120 S.Ct. 58 (1999) (See
Doc.166). His motion under § 2255 was filed on year later on October 4, 2000
(Doc.167).

B. Statement of the Facts

In March of 1985, at the age of eighteen years and while still in high school,
Cantu left five pounds of marihuana with Emery Express for shipment to Arkansas
(Doc.134,pp. 213-219,225,237-239). When faced with criminal charges he admitted
sending the package, but refused to identify his source of supply (Doc.134,pp.222,
240). No charges were filed against Cantu for that offense (Doc.134,p.233). In 1986,

Cantu plead guilty to a misdemeanor offense of possession of marihuana (Doc.117,pp. 32,124-26;G.E.47).

Fabion Cavazos (Cavazos) began working for Cantu trafficking in marihuana in 1986 (Doc.133,pp.42-43;Doc.115,pp.10-12). In the beginning, he and Cantu dealt in 5 to 10 pound quantities (Doc.133,p.42). Until 1988, they sold 10 to 24 pounds per month (Doc.133,pp.119-120). From 1988 until 1990, they sold between 100 and 400 pounds on a monthly basis (Doc.133,p. 120). From 1990 until 1991, they increased their sales to about 1000 pounds per month (Doc.133,pp.120-121).

Cavazos and Cantu began their operation by driving the marihuana to customers in Arkansas, including Terry Crump and Bill Marsh (Doc.133,pp. 43-46). They also supplied marihuana to Russell Blackwell (Doc.133,pp.48-49). In December, 1986, Cavazos was arrested with Blackwell in Louisiana with 25 pounds of marihuana that had been supplied by Cantu (Doc.133,pp.48-49; Doc.134,pp. 386-396,400-401).

Roy Cantu also worked for Cantu selling marihuana (Doc.115,pp. 2-4,12). Roy Cantu was Cantu's older brother and was married to Graciela Cantu (Doc.133,pp. 88,92, 116-117). In January of 1986, Cantu attempted to send marihuana out of the Rio Grande Valley area from the Harlingen airport (Doc.133,pp.136-137,196-198).

4

Roy Cantu and Cantu's cousin, Ricky Russell, were also involved with that attempt and the marihuana was seized (Doc.133,pp.136-137,196-200).

In December of 1987, Bill Marsh was arrested in Carthage, Texas, near the Louisiana border with 10 pounds of marihuana in his car (Doc.134,pp. 359-364). During the same month Cantu and Cavazos were arrested in Carthage, Texas, driving a vehicle that had 13 pounds of marihuana concealed in the door panels (Doc.134,pp.364-370). In May, 1990, one of Cantu's loads of marihuana, consisting of 613 pounds, was seized at the Sarita checkpoint (Doc.133,pp. 55-57,62-64; Doc.134,pp. 405-408).

Cantu's marihuana was sometimes taken to Houston and stored at a mobile home located on Miller Road and occupied by Rudy Garza (Doc.133,pp. 68-70;Doc.135,pp.517-18;G.E.88).   The marihuana was stored there until it was transported to a house on Manitou Road in Houston for delivery to customers (Doc.133,pp. 70-74;Doc.135,pp.517-520;G.E.18). Cantu controlled both properties and had purchased or leased them from Guadalupe Pena (Doc.135,pp.491-520). He paid for the properties with marihuana and with cash (Doc.135,pp. 497-98, 507). Guadalupe Pena was aware of Cantu's marihuana smuggling operation and described Cantu as the boss of the organization (Doc.135,pp. 497-500,522,565-567,574-75).

In January, 1991, Cavazos and Roy Cantu were arrested while transporting 151

5

pounds of marihuana and $47,000 in drug proceeds owned by Cantu (Doc.133,pp. 88-92;Doc.135,pp. 583-593,610-621;Doc.115,pp. 17-18). Cantu had been present during the transaction and was last seen that day at Hobby Airport in Houston (Doc.135,pp. 586-589). Cantu hired attorneys to represent Cavazos and Roy Cantu; he hired Ed Cyganiewicz to represent Roy (Doc.133,p. 92;Doc.135,pp. 414-420;Doc.115,pp. 54-56,67). He also provided them with $1500 each to make bond (Doc.134,pp.254-58;Doc.115,pp.56-59;G.E.39).

Cavazos went to prison from September 1992 until September 1993 (Doc.133,p. 92). Roy Cantu went to prison for a year and 8 months and, during that time, his wife Graciela received monthly checks of $2,008.75 from her sister, Sylvia Rosenbaum, and John Wester that were drawn on the account of the Island Hotel (Doc.133,pp.116-117;Doc.115,pp.18-23;Doc.117,p.55). John Wester was an attorney who went into business with Cantu around 1992 and who was having a romantic relationship with Sylvia Rosenbaum (Doc.137,pp.1118,1122,1126,1134;Doc.115,pp. 12-13). Graciela Cantu never worked at the Island Hotel or anywhere else for the money she received (Doc.137,pp.1192-95,1278-79;Doc.115,pp.18-19, 23).

Antonio Sepulveda began working for Cantu in 1992 after Sepulveda was arrested for possessing cocaine (Doc.116,pp. 2-5). Cantu offered him an opportunity to leave the cocaine business and to work with marihuana instead (Doc.116,pp. 4-5).

Sepulveda's responsibilities included packaging and storing loads of marihuana for Cantu (Doc.116,p. 5). Marihuana was packaged and stored by Sepulveda, Joe Garza and Cantu at the home of Esperanza Vasquez at 124 Camino Del Rey in Brownsville (Doc.133,pp. 51-52; Doc.116,pp. 5-7;G.E.16). At least ten loads of between 200 and 800 pounds were packaged there for Cantu (Doc.116,pp. 8-9). Sepulveda was paid $300 to $500 for each load (Doc.116,pp.12-13).

On three occasions, Sepulveda took loads of Cantu's marihuana from the Camino Del Rey location to Cantu's stash house on Miller Road (Doc.116,pp. 22-26;G.E.94). He then helped Cantu sell the marihuana from the Manitou house (Doc.116,pp.22-24;G.E.18). Sepulveda also delivered about $125,000 in drug proceeds from the sales of Cantu's marihuana on two separate occasions to Cantu at the Manitou house (Doc.116,pp. 33-34). Cantu bought the marihuana for between $160 and 200 per pound and sold it to buyers in Arkansas for $525 per pound (Doc.116,pp. 36-38;G.E.86,87).

In 1992, Jack Collins bought 100 pounds of marihuana from Cantu, but the quality was so poor he could not sell it and Cantu gave him his money back (Doc.135,pp.626-631). In March of 1993, Cantu's sister, Rosario Cantu, was stopped in Refugio County, Texas, while driving a vehicle with insurance in the name and address of Esperanza Vasquez, 124 Camino Del Rey, Brownsville (Doc.133,pp.137-

7

139;Doc.135,pp. 448-451,523).  On occasion, Rosario Cantu carried drug proceeds

for Cantu (Doc.133,pp. 137-139).   At the time of the stop in March, 1993, Rosario

Cantu was in possession of $12,500 in currency that was concealed inside a food

carton (Doc.135,pp.450-452).   Further investigation revealed that the vehicle

identification number of the vehicle she was driving had been tampered with and that

the vehicle had been stolen from Arkansas (Doc.135,pp. 451-456).

Mark Miller (Miller) was from Indiana and a driver for Jerry Lamar, a regular

customer of Cantu's marihuana organization (Doc.135,pp. 666-680).  Miller picked

up 12 loads of marihuana in Houston for Lamar between 1992 and 1995 (Doc.135,pp.

668-690).  In March, 1993, he was stopped in Sulphur Springs, Texas, and found to

be in possession of a small amount of marihuana (Doc.135,pp.655-657).   Miller

decided to cooperate and took law enforcement officers to Cantu's Manitou address

because he thought drugs might be found there (Doc.135,pp. 657-661).   When the

police searched the Manitou house Cantu was present, but no drugs were found

(Doc.135,pp.661-663;Doc.116,pp. 34-36).

Joe Quintero worked for UPS in Harlingen and transported marihuana for

Cantu using UPS trucks and trailers (Doc.133,pp. 57-62).  At one time Joe Quintero

had been married to Cantu's sister, Rosario Cantu (Doc.117,p. 33).  Cantu also used

the UPS facility in Brownsville to ship marihuana out of the Rio Grande Valley

(Doc.116,pp. 9-10). The marihuana would be loaded on to the UPS trailers at 2:00 or 3:00 in the morning (Doc.133,pp. 60-61; Doc.116,pp. 10-12). Sepulveda helped load the trailers at the Brownsville facility and Cantu paid him $300 to $500 for each load (Doc.116,p. 13). On one occasion, Cantu told Sepulveda about a load of his marihuana that had been seized at the UPS facility in Brownsville (Doc.116,pp.14-15;G.E.22). Cantu told Sepulveda that a maintenance worker heard people loading the marihuana and discovered it (Doc.116,pp. 15-16). Cantu then sent two people to alert the driver, who was en route to the UPS facility (Doc.116,pp.15-16).

In fact, during April 1993, 645 pounds of marihuana was seized from the back of a UPS trailer at a UPS warehouse located in Brownsville, Texas (Doc.135,pp. 471-478). Police responded to a report and inspected the trailer at 2:45 a.m. to confirm that it contained boxes of marihuana (Doc.135,pp. 471-73). They left the boxes intact and set up surveillance to see who would pick up the load (Doc.135,p. 473). A driver arrived at 6:00 a.m. and acted as if he was inspecting the trailer (Doc.135,pp. 473-74). The driver opened the trailer door but did not enter; instead, he threw his arms in the air in a gesture consistent with surprise and immediately went to UPS security and told them about the marihuana in the trailer (Doc.135,pp. 474-475). The officer who had originally inspected the boxes of marihuana was watching and knew that the

driver could not have observed the marihuana from his position outside the trailer; he formed the opinion that the driver was feigning surprise (Doc.135,pp. 474-75).

After Cavazos was released from prison for the 1991 offense, he continued to work for Cantu (Doc.133,pp. 92-93). Between 1993 and April of 1995, he helped Cantu sell between 800 and 2000 pounds of marihuana per month (Doc.133,pp. 121-123,125). By December 1994, Roy Cantu was also working for Cantu again and Cantu stored marihuana at Graciela Cantu's house (Doc.115,pp. 6-7). The marihuana was brought there on three occasions by Cavazos, Roy Cantu and someone named Julio (Doc.115,pp. 7-8). It was unloaded and repackaged and remained at the house for about two weeks (Doc.115,pp.8-9). Cantu would go to the house when the marihuana was there, but he did not physically transport it (Doc.115,pp. 9-10).

In October, 1994, Terry Crump was arrested in northeast Texas with 40 pounds of marihuana (Doc.135,pp. 460-467). The marihuana was concealed in a dog kennel located in the back of his vehicle and it had been loaded at the Manitou house by Cavazos and Roy Cantu for Cantu (Doc.133,pp.107-110;Doc.135,pp.466-67).

After his arrest in 1993, Miller stopped transporting marihuana for Jerry Lamar until 1994 (Doc.135,pp.675-74). In July 1994, he agreed to pick up marihuana at Cantu's Manitou house (Doc.135,pp. 679-680;G.E.18). After Miller arrived, Rudy Garza left to pick up the marihuana from a different location (Doc.135,pp.679-

681;G.E.94). Miller made trips to the Manitou address to get marihuana in August 1994, and November 1994 (Doc.135,pp.682-685). In November there were several people at the Manitou house, including Rudy Garza (Doc.135,p.685). Two people were introduced to Miller as Roy and Fabian (Doc.135,p.685). While picking up that load, Miller also received a package of marihuana which he delivered to Terry Crump in Hot Springs, Arkansas before returning to Indiana (Doc.135,pp. 684-685;G.E.87).

Miller went to the Manitou location again in January 1995, to pick marihuana (Doc.135,p. 686). On his return trip he took 30 pounds of marihuana to Indiana and a larger package of marihuana to Terry Crump in Arkansas (Doc.135,p. 686). In March 1995, Miller returned to the Manitou address again for marihuana (Doc.135,p. 687). This time Cantu was present and introduced himself to Miller as Fabian (Doc.135,pp. 687-88). During that meeting, Lamar gave $11,000 to the other people who were present and they counted it (Doc.135,pp. 688-69). On his return trip, Miller took marihuana to Terry Crump in Arkansas and to Indiana (Doc.135,p. 689).

Alfonso Zaleta or Poncho (Zaleta) met Cantu in the fall of 1992, while Zaleta was accompanying a Mexican supplier of marihuana named Mundo to the United States (Doc.134,pp. 269-272). Mundo took Zaleta to Cantu's house where Cantu agreed to purchase 260 pounds of marihuana for $200 per pound (Doc.134,pp. 271-273). The delivery was made in Brownsville and Cantu paid for the marihuana by

handing Mundo a bag of money (Doc.134,pp. 273, 276). During November of 1992, Zaleta assisted Mundo in supplying Cantu with a second load of marihuana (Doc.134,pp. 277-78). They delivered 300 pounds of marihuana to Cantu's workers and Cantu paid them $200 per pound (Doc.134,pp. 278-281). In February of 1993, Zaleta made arrangements with Cantu to sell him 400 pounds of marihuana at $180 per pound (Doc.134,pp. 282-284). The marihuana was delivered to Cantu's workers at a McDonald's parking lot and Cantu paid Zaleta for the marihuana (Doc.134,p. 285).

Zaleta supplied Cantu with a fourth load of marihuana in April of 1995 (Doc.134,pp. 287-289). He delivered 400 pounds of marihuana at a price of $180 per pound (Doc.134,pp. 287-289). Cantu arranged for Zaleta to pick up the money at a condominium owned by Cantu and used by Cavazos (Doc.133,pp.79-82;Doc.134,pp. 289-291;G.E.4). Cantu had purchased that condominium and another one just like it for $30,000 from Sepulveda and paid for them with marihuana (Doc.116,pp.16-28). While they were at the condominium, Cantu instructed Cavazos to give Zaleta the money for the marihuana (Doc.134,p. 290).

While Zaleta was supplying Cantu with marihuana, he was contacted by Mexican nationals Sergio Gomez and Rafael Ornelas who wanted to be paid a tariff of $50,000 to move marihuana through Matamoros (Doc.134,pp. 294-297). Zaleta

12

then made arrangements for Cantu to meet with Gomez and Ornelas and Cantu paid them $50,000 (Doc.134,pp. 294-297).

In April 1995, Miller returned to the Manitou house to take another load of marihuana (Doc.135,p. 690). Cantu was present with Roy Cantu and a third person, whom he introduced as Little Roy (Doc.135,pp. 690-91,706-707). Also present was the first person who had introduced himself to Miller as Fabian (Doc.135,p. 691). Miller was planning on taking marihuana to Arkansas and Indiana and Cantu asked him if he would be willing to also take some marihuana to Milwaukee, Wisconsin (Doc.135,p.692). Miller agreed and received a 30 pound package for Indiana, a 50 pound package for Arkansas and a large duffle bag containing about 100 pounds for Milwaukee (Doc.135,pp.692-693). The marihuana was brought to the Manitou house by Rudy Garza and the other Fabian helped Rudy load it (Doc.135,pp.694-95).

When he was about 200 miles hours outside of Houston, Miller was stopped by a law enforcement officer for a traffic violation at around 3:00 p.m. on the afternoon of April 25, 1995 (Doc.135,pp. 696,699; Doc.136,pp.758-759). His vehicle was searched and 198 pounds of marihuana was discovered (Doc.136,p.761). Miller decided to cooperate and told law enforcement officers the source of the marihuana (Doc.135,p.696; Doc.136,p.761). The officers then devised a plan to disable Miller's

13

vehicle and to have him call for someone to pick him up (Doc.136,p.763). They used a public telephone located at Highway 59 in Teneha, Texas (Doc.136,p.762).

Miller had two telephone numbers with him; one had been given to him by Lamar and a second by one of the people at the Manitou house (Doc.135,pp. 696-97). Miller called the first number and someone answered: "Rudy's Place" (Doc.135,pp. 697-98). Miller said that his vehicle had broken down and was told that Roy and Fabian were at the other house (Doc.135,p. 698). At 8:30 p.m. Miller called a pager number and left his number (Doc.135,pp. 698-99;Doc.136,pp.762-63,773-74). Miller then received a call and was told to wait by his vehicle until someone came to pick up the marihuana (Doc.135,p. 699; Doc.136,p. 763). In the meantime, Cantu called Cavazos and instructed him to help Miller (Doc.133,pp. 94-95).

Telephone records from April 25, 1995, showed that at 11:01 a.m. that day a call was made from a telephone at the Manitou house to Milwaukee (Doc.117,pp.73-74,83-85;G.E.60,77,124). Records also showed that at 4:04 p.m. a call was made from the Manitou house to a telephone subscribed to by Terry Crump in Arkansas (Doc.117,pp.85-86;G.E.60,77,124). At 8:33 p.m. a call was made from Rudy Garza's cellular telephone to Cantu's pager (Doc.115,p.46;Doc.117,pp.70,86-87;G.E.72,91,124). At 8:40 p.m. a call was returned to that telephone from a telephone that Cantu had in the name of Gloria Villacana (Doc.117,pp.57-

14

88;G.E.60,82).  At 8:41 p.m. a call was made from the Manitou house to a pay telephone in Tenaha, Texas (Doc.117,p. 89;G.E.60,77).

About three and a half or four hours after Miller placed the calls, Cavazos and Roy Cantu arrived in two vehicles (Doc.133,pp.97-100;Doc.135,p.700; Doc.136,pp.764-765;G.E.28).  Cavazos was driving an Explorer that was registered in Cantu's name (Doc.136,pp. 775-777, 790-91). The police watched as they loaded the marihuana into the two vehicles; then they arrested the two men (Doc.135,p.701; Doc.136,pp.764-765). Rudy Garza's cellular telephone was found inside the Explorer (Doc.136,p. 777; Doc.117,p.70;G.E.72).

After Cavazos' arrest in April 1995, Cantu hired Bill Portis to represent him (Doc.133,pp. 102-103;Doc.134,pp.418-419;G.E.44).  Cavazos was sentenced to 48 months and was still serving his sentence when he testified at Cantu's trial (Doc.133,pp. 103-104).  Cantu provided Cavazos with $100 to $200 per month while he was in custody (Doc.133,pp. 131-132).

Cantu told Sepulveda that he had various women get telephones for him in their names (Doc.116,pp. 45-46;G.E.50A).  Telephone records from the period from October 1993, to April 1995, showed that 13,939 calls were made with telephones controlled by Cantu (Doc.117,pp. 47-74,81-82;G.E.50A).  The same records showed that during that time frame, 1500 calls were made back and forth from Cantu's

15

telephones to numbers connected to Gary Cantu; 640 calls back and forth to numbers connected to Cavazos, 250 calls back and forth to numbers connected to Rudy Garza and 620 calls back and forth to numbers connected to Graciela Cantu (Doc.117,pp.75-77;G.E.50A). Telephone records also showed that 1800 calls were made between telephones controlled by Cantu and telephones connected to the Manitou and Miller Road addresses and several hundred telephone calls were made back and forth to those locations from telephones connected to Cavazos and Roy Cantu (Doc.117,pp. 80-81;G.E.50B).

From 1990 to 1995, Cantu reported to the Internal Revenue Service that he had legitimate earnings of $143,000, with $123,000 remaining after taxes (Doc.136,pp. 960, 1038-1043).. During that same time frame he acquired at least an additional $700,000 in unexplained wealth (Doc.136,p.1046). At one point he described himself to Cavazos as a millionaire (Doc.133,p. 158). He owned a $36,000 boat (Doc.133,pp.105-106; Doc.136,pp.804-821; G.E.24). He purchased the Manitou house for $70,000, with a down payment made in marihuana (Doc.135,pp. 502-503). He owned a $10,000 Ford Explorer (Doc.117,pp.24-25;G.E.35), a $19,000 BMW (Doc.136,pp. 831-833), an antique Ford car (Doc.136,pp.822-826), and a $30,000 Tahoe (Doc.116,pp. 7-12,23;G.E.34,55,70). He made $4,690 in repairs on a Porsche (Doc.134,pp. 291-292;Doc.117,p. 16;G.E.25,56). He spent $37,000 to improve the

Shull Ranch, which he purchased for $67,000 (Doc.136,pp.840-846; Doc.115,pp.31-32;G.E.1). He paid $40,000 for a residence on Young Street (Doc.136,pp. 862-869). When a warrant was executed at Cantu's Shull Ranch, $44,000 in jewelry was found in a hidden compartment (Doc.136,pp. 989-92,1062;68A,68B ).

In 1995, Cantu reported to the Internal Revenue Service that he owned 51 percent of the Island Hotel and that Travexco owned the remaining 49 percent (Doc.136,pp. 960-961). He reported an 85 percent ownership interest in Travexco (Doc.136,p. 961). John Wester had created the Travexco company in 1993 on behalf of Cantu and gave Cantu an 80% ownership interest at that time (Doc.137,pp. 1145,1151). Island Hotel owned 100% of a corporation called Pedro Chevy (Doc.136,p. 966). Pedro Chevy operated a restaurant called Pesos Restaurant and a pool hall called Rack'Em (Doc.136,p. 967). In 1996, Cantu claimed ownership of the Island Hotel for the previous three years (Doc.136,p. 928;G.E.3,34).

Although the legal documentation reflected he invested $1,000, Cantu invested about $250,000 in the purchase and development of the Pesos Restaurant and Island Hotel on South Padre Island (Doc.137,pp. 1152, 1169, 1225-27; Doc.115,pp. 38-40; Doc.116,pp.50-51). Part of the purchase money, $75,000, was delivered to John Wester by Roy Cantu in a sack (Doc.115,pp. 12-17). In February 1994, Cantu gave Zaleta $100,000 to assist him with opening a nightclub in Mexico (Doc.134,pp. 297-

300;G.E.116 A). When Zaleta was unsuccessful in obtaining the permits, Cantu instructed him to wire transfer the money to the Island Hotel bank account (Doc.134,p. 302; Doc.136,pp. 921-925). Cantu took the money that Zaleta wired him and issued shares of stock of Travexco in Zaleta's name, but without Zaleta's knowledge (Doc.136,pp. 925-926).

An additional $200,000 was transferred into the venture through a Mexican national named Victoria Morales (Doc.137,pp. 1151-52, 1201, 1203). Morales was in the marihuana business about the same time that Zaleta was supplying Cantu with marihuana (Doc.134,pp. 293-94). Most of the money Morales provided to the venture was in United States currency that she brought directly to the restaurant on a weekly basis for about ten weeks (Doc.137,pp. 1204-07). At one point she wire transferred $84,500 (Doc.137,p.1207). Although stock certificates for Travexco were issued in Morales' name in April of 1994, Cantu had retained custody of them (Doc.137,p.1160, 1207-1210).

In July 1996, Cantu paid $10,000 for a deposit on a lease for a nightclub, $4,000 for the club's liquor license and at least $3700 for improvements, but the nightclub was only open for business three weeks (Doc.136,pp. 880-887;Doc.117,p.16). He paid $15,000 on a second business lease in the name of Pedro Chevy corporation which he broke after a short period of time (Doc.136,pp. 890-92).

In 1996, the records for Travexco, Island Hotel Pedro Chevy showed that they were making big profits when, in fact, the companies were losing money (Doc.137,pp. 1221-1224;G.E.60).

When Cantu was arrested on January 28, 1997, he was in possession of a marihuana cigarette (Doc.117,pp. 2-5). The following day several weapons and a usable amount of marihuana was recovered from the master bedroom in Cantu's Shull Ranch (Doc.136,pp. 995-1002, 1006, 1027).

The <em>Apprendi</em> Claim is not Cognizable under § 2255

Cantu contends that according to the Supreme Court's decision *Apprendi v. New Jersey*, 530 U.S. ___, 120 S.Ct. 2348 (2000), he was illegally sentenced because the jury was not instructed to determine the amount of drugs involved. In *Apprendi*, the Supreme Court announced the limited rule that "'fact[s] that increase[] the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *United States v. Meshack*, 225 F.3d 556, 576 (5th Cir. 2000) (quoting *Apprendi*, 505 U.S. at ___, 120 S.Ct. at 2362-2363). In *United States v. Doggett*, 230 F.3d 160, 164 (5th Cir. 2000), this court held, in light of the fact that § 841 calls for a factual determination regarding the quantity of the controlled substance which significantly increases the maximum penalty, if the United States seeks enhanced penalties under § 841(b), "the quantity must be stated in the

indictment and submitted to a jury for a finding of proof beyond a reasonable doubt."

In *Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 1075 (1989), the Court held that "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Cantu's case became final on October 4, 1999, when his petition for writ of certiorari was denied. *See United States v. Thomas*, 203 F.3d 350 (5th Cir. 2000)), a date before the *Apprendi* decision in 2000. Therefore, Cantu must demonstrate that the *Apprendi* rule falls within one of the *Teague* exceptions or he is precluded from raising his *Apprendi* claim in this § 2255 proceeding.

"The *Teague* rule that new criminal procedural rules cannot be applied retroactively on collateral review has two exceptions." *United States v. Shunk*, 113 F.3d 31, 35 (5th Cir. 1997). The first is "when the new rule places `certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.'" *Id*. (citing *Teague*, 489 U.S. at 307, 109 S.Ct. at 1073). The second exception "is for those rules requiring the observance of procedures `implicit in the concept of ordered liberty.'" *Id*. 311, 313, 109 S.Ct. at 1076, 1077).

In *Shunk*, the Court of Appeals for the Fifth Circuit held that the rule announced in *United States v. Gaudin*, 515 U.S. 506, 115 S.Ct. 2310 (1995),

requiring the government to prove in a prosecution under 18 U.S.C. §1001 materiality

to the jury, instead of the judge, did not meet the second *Teague* exception:

> ... As noted, rules requiring the observance of procedures `implicit in the
> concept of ordered liberty' are `watershed' rules, of which few have yet
> to emerge. Requiring the Government to prove materiality to the jury,
> instead of the judge, is not a `watershed' rule of criminal procedure,
> even though *Gaudin* was a clear break with prior decisions. Obviously,
> the fact that the *Gaudin* rule is new does not necessarily make it
> `watershed'. Furthermore, one can easily envision a system of `ordered
> liberty' in which certain elements of a crime can or must be proved to a
> judge, not to the jury.

> In sum, *Gaudin* error does not meet the second *Teague* exception.
> *Accord United States v. Swindall*, 107 F.3d 831, 836 (11th Cir.
> 1997)("The *Gaudin* rule ... is not a watershed rule ... that alters our
> understanding of the bedrock procedural elements essential to the
> fairness of a proceeding.").

*Shunk*, 113 F.3d at 37.

The new rule announced in *Apprendi* requiring submission of certain

sentencing facts to the jury for a finding beyond a reasonable doubt is no different

that the new rule announced in *Gaudin* that materiality must be found by a jury and

not a judge, therefore the analysis in *Shunk* should be controlling here. In fact, the

Court of Appeals for the Ninth Circuit reached that conclusion in *Jones v. Smith*, 231

F.3d 1227, 1235-37 (9th Cir. 2000), and held that the *Apprendi* rule as applied to the

omission of certain necessary elements from a state court information, was "neither

implicit in the concept of ordered liberty nor an absolute prerequisite to a fair trial."

That holding is in accord with the decision by the Court of Appeals for the Fifth Circuit in *In re Tatum*, 233 F.3d 857, 858 (5th Cir. 2000), that an *Apprendi* claim is not cognizable in a successive § 2255 motion because the Supreme Court did not expressly declare collateral availability of the rule or apply it in a collateral proceeding (citing 28 U.S.C. §§ 2244(b)(3)(C) and 2255 and *United States v. Rich*, 141 F.3d 550, 553 (5th Cir. 1998)). In àddition, several district courts have concluded that the *Apprendi* rule does not fall within any *Teague* exception. *See United States v. Johnson*, ___ F.Supp.2d ___, 2000 WL 1801401 (D.Neb. Dec.7, 2000); *United States v. Joseph, III*, ___ F.Supp.2d ___, 2000 WL 1789989 (E.D.La. Dec.5, 2000); *West v. United States*,123 F.Supp.2d 845, 2000 WL 1790425 (D.Md. Dec. 4, 2000); *United States v. Pittman*, 120 F.Supp.2d 1263, 2000 WL 1708962 (D.Or. Nov. 15, 2000); *but see United States v. Murphy*, 109 F.Supp.2d 1059, 1064 (D.Minn. 2000). Cantu's claim is therefore not cognizable in this proceeding.

<u>Failure to Demonstrate Cause and Prejudice</u>

Assuming *arguendo*, that the *Apprendi* rule does fall within a *Teague* exception, Cantu must show both cause for his failure to raise this issue at trial, and on direct appeal, and prejudice. *United States v. Frady*, 456 U.S. 152, 167-68, 102 S.Ct. 1584, 1594 (1982). A showing of cause requires a showing of some external impediment that prevented the petitioner from raising the claim. *See McCleskey v.*

*Zant*, 499 U.S. 467, 497, 111 S.Ct. 1454, 1472 (1991). Even though the law may have been settled against him on an issue, "the futility of raising an objection ... cannot alone constitute cause for a failure to object at trial." *Engle v. Isaac*, 456 U.S. 107, 130, 102 S.Ct. 1558, 1573 (1982).

To show prejudice, the defendant must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage." *Frady*, 456 U.S. at 170, 102 S.Ct. at 1596 (emphasis in original). Cantu does not allege, and cannot demonstrate, either cause or prejudice for his procedural default with regard to his claim of *Apprendi* error. First, the amount and type of drugs involved was alleged in the indictment; Cantu was charged with conspiring to possess with intent to distribute 1000 kilograms or more of marihuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846 (Doc.1,pp.1-5). Therefore, Cantu's claim of error is the same type of error addressed by the Court in *Frady*, 456 U.S. at 168-75, 102 S.Ct. 1595-98, that is, jury instruction error. As the Court explained, to demonstrate prejudice, a defendant on collateral review must show more than what would be required to demonstrate plain error. *Id*. 456 U.S. at 166, 102 S.Ct. at 1593. Further, the degree of prejudice from instruction error must be evaluated in the total context of the events at trial. *Id*. 456 U.S. at 169, 102 S.Ct. at 1595. As the Court explained in *Frady*,

"a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction."

*Id.* (citation omitted).

In this case, the jury had a copy of the indictment during deliberations (See Doc.138,p.1466). The indictment described count one as a conspiracy to possess with intent to distribute 1000 kilograms or more of marihuana that began in 1985 and continued until the time of indictment (Doc.1,pp.1-5). This court twice admonished the jury that they could only convict Cantu on count one if they found him guilty of the conspiracy charged in the indictment and not some other conspiracy (Doc.137,p.1334; Doc.138,p.1473); it also instructed them he was not on trial for "any other thing other than what is alleged in the indictment (Doc.138,p.1433). Defense counsel emphasized that portion of the court's instruction in his closing argument (Doc.138,p.1396-97; see pp. 29-30, *infra*). Because the jury knew they could only convict Cantu of the conspiracy alleged and they knew from the indictment that the conspiracy alleged involved 1000 kilograms or more of marihuana, they were sufficiently instructed to warrant application of § 841(b)(1)(A) under *Apprendi*. *See United States v. Leahy*, 82 F.3d 624, 631 (5th Cir. 1996) (claim

24

of variance between indictment and instructions rejected where jury provided with indictment and told defendant not on trial for any offense not alleged in indictment); *see also United States v. Marroquin*, 218 F.3d 455, 457 (5th Cir. 2000)(argument of counsel and allegations in indictment demonstrated adequacy of jury instructions on direct appeal). Moreover, the fact that the jury acquitted on the substantive counts is irrelevant. Juries are free to return inconsistent verdicts. *United States v. Short*, 181 F.3d 620, 625 (5th Cir. 1999). The fact that inconsistent verdicts are returned does not impact on the sufficiency of the evidence analysis. *United States v. Posadas-Rios*, 158 F.3d 832, 861 (5th Cir. 1998). Finally, the evidence that the conspiracy in this case involved 1000 kilograms or more of marihuana was overwhelming. Immediately after the parties rested and the jury began its deliberations, this court made a finding from the evidence presented at trial that Cantu was involved with 10,300 kilograms of marihuana during the course of the conspiracy (Doc.138,pp.1441-45). Cantu did did not disagree that there was evidence presented as to this quantity; and, at sentencing did not present evidence to dispute this finding as to quantity (Doc.138,p.1445; Doc. 140,pp.5-6). In view of the evidence the jury heard, as recounted in detail at pp. 3-19, *supra*, as well as the allegations in the indictment and the jury instructions that were given, Cantu cannot show that the omission from the jury instructions of an explicit finding by the jury on quantity worked to his actual

25

and substantial disadvantage. *See Frady*, 456 U.S. at 170-75, 102 S.Ct. 1596-98.

<u>Misstatement in Jury Instructions</u>

Cantu also contends that this court improperly instructed the jury on the burden of proof in violation of his right to due process. Since Cantu did not raise this issue on direct appeal, he must again demonstrate cause and prejudice. *Frady*, 456 U.S. at 167-68, 102 S.Ct. at 1594. Cantu has failed to allege facts which would support a finding of cause for his procedural default. In addition, this record refutes any claim that the error in the jury instructions worked to his actual and substantial disadvantage. *See id*. 456 U.S. at 170, 102 S.Ct. at 1596.

As Cantu points out, at one point in its instructions, this court misspoke as to the burden of proof:

> The Government has the burden of proving the defendant's guilt beyond a reasonable doubt. <u>If the Government did not prove his guilty beyond a reasonable doubt, you should find the defendant guilty</u>.

(Doc.137,p.1312). The mistake was not obvious because there was no objection to the statement by defense counsel (Doc.137,p.1312). In fact, after concluding its instructions the court inquired of counsel whether there was any objection and counsel answered he only objected to the failure to include an instruction as to character evidence (Doc.137,p.1336-37). Immediately following the misstatement, this court correctly instructed the jury on the burden of proof:

26

Now, the Government's burden is a heavy burden, it is a strict burden, but it is not necessary that the Government's proof exclude all doubt or all reasonable doubt. Because, humanly speaking, it is probably impossible for any human being to prove something to another human being beyond all doubt.

What is required is that the Government's proof exclude any reasonable doubt concerning the defendant's guilt.

And a reasonable doubt is a real doubt. It is a real doubt based upon reason and common sense after careful and impartial consideration of the evidence in the case.

Proof beyond a reasonable able doubt is proof of such a convincing character that you would be willing to act and rely upon it without hesitation in the most important of your personal matters.

Ifyou are satisfied that the Government has proven the defendant's guilt beyond a reasonable doubt, you should find him guilty. If you are not satisfied that the Government has met that burden, you should find the defendant not guilty.

(Doc.137,p.1312).

The record also reflects that the court correctly allocated the burden of proof prior to the misstatement:

And the law presumes him to be innocent. And what that means is, that he is by you to be presumed innocent throughout your deliberations until such time, if ever, you as a juror is satisfied that he has been proven guilty beyond a reasonable doubt.

Unless you are satisfied beyond a reasonable doubt that he is guilty, that presumption of innocence alone is sufficient for you to find him not guilty.

(Doc.137,p.1311). This court later referred to the requirement of a finding beyond a reasonable doubt in the context of its aiding and abetting instruction (Doc.137,pp.1322-23); and its instruction regarding the date alleged (Doc.137,p.1324). This court also prefaced each of its instructions on the substantive drug counts with the explanation: "Now, what must you find beyond a reasonable doubt before you can find the defendant, Javier Lopez Cantu, guilty of any of those counts that I have – that I have called to your attention regarding possession with intent to distribute? Three things." (Doc.137,p.1325). After describing the three elements, this court again reminded the jury of the correct burden of proof:

> With respect to all of the substantive counts involving the possession of marijuana, if you find that the Government has proven those matters beyond a reasonable doubt that I have just mentioned to you, you should find the defendant guilty.
>
> If you do not – if you are not satisfied that the Government has proven those matters beyond a reasonable doubt, you should find the defendant not guilty of possession -- of the possession counts, substantive counts, of marijuana with intent to distribute.

(Doc.137,p.1326). Similarly, with regard to the conspiracy counts alleged in counts one and nine, this court introduced the elements of the offense with the explanation that they had to be proven by the Government beyond a reasonable doubt: "For you to find the defendant guilty of Count Number 1 and/or Count Number 9 ... you must be satisfied that the Government has proven all of these following matters beyond a

reasonable doubt." (Doc.137,p.1331). After explaining the elements of conspiracy,

this court again correctly allocated the burden of proof:

> If you are satisfied that the Government has proven those three things beyond a reasonable doubt, you should find the defendant guilty of Count 1 and/or Count Number 9.
>
> <u>If you are not satisfied that the Government has proven those matters beyond a reasonable doubt, you should find the defendant not guilty of Count Number 1 and/or Count Number 9.</u>

(Doc.137,p.1332).

> During closing argument, defense counsel correctly stated the burden of proof:
>
> The bottom line is, ladies and gentlemen, there are two or three instances where Javier Cantu was found with a small amount of marijuana.
>
> In the court's instructions he tells you, you cannot find him guilty unless you are convinced beyond a reasonable doubt that he is guilty of this conspiracy alleged. Not some other conspiracy.
>
> Meaning, it is not a situation where Javier Cantu hasn't done anything because he has. He tried to ship five pounds of marijuana at Emery.
>
> Arguably there is enough evidence to show that he knew about the evidence – the marijuana in the truck in Carthage in 1987.
>
> We know he was caught with a joint. We saw him plead guilty to that. Caught with a joint at a concert.
>
> And we know that there was a little bit of marijuana at his ranch when he was arrested.
>
> Don't use that knowledge, don't – if you believe that beyond a reasonable doubt, that's not sufficient evidence to show he was a

member of this conspiracy. If you believe that beyond a reasonable doubt, don't say well, I am looking at the Court's charge and I think – if I believe any one of these things, then I have to believe he is a conspirator. That is not true.

<u>What the Court's charge is, that he is accused in this conspiracy, the Government has the burden of proving beyond a reasonable doubt this conspiracy, if you believe he is a member of another conspiracy with Fabian back in 1987 or had never intended to become a member of this conspiracy that Roy and Fabian and Sepulveda them have, or if you even have a doubt, you should find him not guilty.</u>

What do I mean by him that? Or even if you have a doubt. It is not a situation where you go back and go, well, did he do it or didn't he do it? Did he do it or didn't he do it?

It is a situation where yo go back there and you say, "Am I convinced beyond a reasonable doubt that he did it? Am I so convinced that I would entrust the most important of my personal affairs to my decision today? Am I so convinced that I can sleep at night knowing that I found a person guilty on this evidence? Am I that convinced?"

Because, you know what, if you hesitate, if you are not that convinced, if you think, you know, there is an awful lot of smoke, I am sure there is some fire there but I am not convinced, or you think, you know what, I sure wish the Government would have taped him or found some marijuana at his ranch or gotten all these people in here to support what the hostages are saying, I sure wish the Government would have brought me somebody other than someone who has got a gun to their head, if you even think about that, <u>the Court instructs you, you have a reasonable doubt, you have got to return a verdict of not guilty</u>.

(Doc.138,pp.1396-98). Just before defense counsel concluded his argument, he told the jury that the prosecutor would have the last word because the prosecutor had "the burden of proving this case beyond a reasonable doubt." (Doc.138,p.1409). Defense

30

counsel then called for individual jurors not to give up their beliefs to satisfy the other

jurors and argued: "If you are not convinced that the Government has proven each

and every element of the indictment, say by your verdict of not guilty and be proud

saying it." (Doc.138,p.1410).  When this court gave its final instructions to the jury,

it again inquired whether there were objections and defense counsel twice asserted

there were none (Doc.138,pp.1433-38).

Cantu argues that the fact that the jury requested additional instructions on the

relationship between the conspiracy and substantive counts (See Doc.66), emphasized

the misstatement regarding the government's burden of proof.  This court's

instructions in response to that inquiry, however, correctly stated the government's

burden of proof.  This court prefaced its description of the three elements, including

the requirement that the defendant knowingly and willfully possess the marijuana in

question, of the substantive counts with the statement "You must find all of the

following things beyond a reasonable doubt:" (Doc.138,p.1465).  This court also

informed the jury that if they did not find "the defendant engaged in that conduct

knowingly and willfully as would regard any of those counts, you should find the

defendant not guilty of those counts." (Doc.138,pp.1465-66).  The court similarly

prefaced it description of the law of conspiracy: "Now, for you to find the defendant

guilty of Count 1 and/or Count 9, these are the things that must be proven to your

satisfaction beyond a reasonable doubt." (Doc.138,p.1466).  After describing the

elements of conspiracy, this court correctly instructed the jury on the burden of proof:

> If you find with respect to Count 1 and Count 9 that the Government has
> proven those matters beyond a reasonable doubt as would regard the
> defendant, you should find him guilty of Count Number 1 and Count
> Number 9.
>
> If you find that the Government has failed to prove all of those elements
> beyond a reasonable doubt with respect to the defendant, you should
> find him not guilty of Count Number 1 and Count Number 9.

(Doc.138,pp.1467).  This court concluded its instructions in relation to the jury

question by reiterating the correct burden of proof:

> THE COURT: Okay.  Remember, emphatically, each count is a – is to
> be considered separately and independently and apart from all other
> counts.  The fact that you find a person guilty of one count should not
> control your verdict as to any other count.  You understand.  But you
> must be satisfied before you find the defendant guilty of any count by
> proof beyond a reasonable doubt of all the elements that constitute an
> offense under the count that you have under consideration.  And if you
> are not satisfied that it has been proven beyond a reasonable doubt, you
> should find the defendant not guilty, you understand, of all the elements.

(Doc.138,pp.1473-74).  After this court concluded its supplemental instructions, it

inquired whether there was any objection and counsel for Cantu asserted there was

no objection (Doc.138,p.1474).  On this record, it cannot be said that Cantu was

actually prejudiced by the misstatement.  In addition, the United States has ordered

a transcript of the voir dire in this case, which it has reason to believe will further

demonstrate that this court correctly and repeatedly instructed the jury on the burden of proof.

As noted in relation to Cantu's previous claim of error, to establish prejudice to the degree sufficient to excuse his procedural default in failing to raise this claim at trial or on appeal, he must do more than establish plain error. *Frady*, 456 U.S. at 166, 102 S.Ct. at 1593. Courts have held, however, that even under plain error standard reversal is not required under circumstances similar to those present in this case. *See United States v. Hanley*, 974 F.2d 14, 17-19 (4th Cir. 1992); *United States v. McCue*, 643 F.2d 394, 396 (6th Cir. 1981). In fact, in *United States v. Rosa*, 493 F.2d 1191, 1195 (2d Cir. 1974), the Court of Appeals for the Second Circuit held such error harmless despite defense counsel's request for a curative instruction at the time of the misstatement. Cantu has failed to allege facts sufficient to warrant any relief under § 2255.

## Alleged Perjury before the Grand Jury

Cantu contends that his brother, Roy Cantu, allegedly presented false testimony to the grand jury that indicted Cantu and that the United States allegedly had reason to believe it was false. He has submitted what purports to be an affidavit of Roy Cantu to support this claim. In that affidavit the affiant states he repeatedly told interviewing agents that Cantu was not involved in drug trafficking and that he only

33

agreed to appear before the grand jury after repeated threats of being charged. He claims that all of his testimony before the grand jury regarding his brother's involvement in drug trafficking and money laundering was false and that he believed the Assistant United States Attorney Charles Lewis and other members of the United States government knew it was false.[1]  A recently published opinion in the Court of Appeal reflects that Roy Cantu was convicted of racketeering based on the same facts as those underlying Cantu's drug trafficking conspiracy conviction. *United States v. Cantu*, 185 F.3d 298 (5th Cir. 1999).  The court's opinion in that case recounts the circumstances that led to Roy Cantu's indictment, his cooperation for purposes of obtaining a Rule 35 reduction after his conviction for conspiracy to possess

---

[1]  The United States challenges the sufficiency of Cantu's proffer to raise a fact issue as to whether perjured testimony was presented to the grand jury.  Sworn statements that contradict previously sworn testimony are untrustworthy. *See Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir. 1996); *United States v. Lumpkin*, 192 F.3d 280, 286-87 (5th Cir. 1996).  Where the contradicted statements are that of a defendant made at the time of his guilty plea, the Court of Appeals for the Fifth Circuit has required the defendant to produce independent indicia of the likely merit of his allegations, typically in the form of one or more affidavits from reliable third parties. *United States v. Cervantes*, 132 F.3d 1106, 1110 (5th Cir. 1998).  In addition, Roy Cantu's statements are particularly unreliable not only because they contradict previously sworn statements, but because of sworn testimony at the sentencing hearing that demonstrated that Cantu intimidated Roy Cantu, Antonio Sepulveda and Graciela Cantu because of their cooperation with the United States in this case (Doc.127;Doc.140,pp.17-46; Doc.141,pp.5-38; *See also* PSR at ¶'s 23,24).  This court previously made findings regarding Cantu's persuasion of Roy Cantu not to testify in this case (Doc.127,p.1).  This court should deny relief because Cantu cannot demonstrate cause and prejudice (*See* discussion at p.35, *infra)*, but if he were to surmount that hurdle, the United States challenges the affidavit as too unreliable to warrant an evidentiary hearing.

34

marihuana with intent to distribute and his later refusal to cooperate in this case. *Id.* at 300-301 (footnotes omitted).

Because Cantu is making a non-jurisdictional challenge to the indictment, his claim is waived under Fed.R.Crim.P.12(b), unless he can show cause and actual prejudice. *Frady*, 456 U.S. at 167, 102 S.Ct. at 1594; *Davis v. United States*, 411 U.S. 244, 93 S.Ct. 1577 (1973). A showing of cause requires a showing some external impediment that prevented the petitioner from raising the claim. *See McCleskey v. Zant*, 499 U.S. at 497, 111 S.Ct. at 1472. Cantu has fail to allege facts which would support a finding that some external impediment prevented him from raising this claim on direct appeal.

Nor can Cantu demonstrate actual and substantial prejudice. He concedes that Roy Cantu was not a witness against him at trial (Doc.167,p.5). Assuming *arguendo*, that Roy Cantu's affidavit is sufficient to raise a factual issue whether he perjured himself before the grand jury, this court need not resolve that issue in a hearing because Cantu's later conviction (without Roy Cantu's testimony) was sufficient to render any error harmless. *United States v. Cobleigh*, 75 F.3d 242, 251 (6th Cir. 1996) (citing *United States v. Mechanik*, 475 U.S. 66, 71-73, 106 S.Ct. 938, 942-43 (1986)). Cantu has failed to allege facts which, if true, would justify either his procedural default or warrant relief under § 2255.

35

## Alleged Prejudicial Pretrial Identification

Cantu also contends that his judgment and conviction should be vacated because of an allegedly impermissibly suggestive pretrial identification of him by witness Mark Miller. Once again, Cantu must demonstrate both cause and prejudice because he did not raise this issue on direct appeal. *See Frady*, 456 U.S. at 167, 102 S.Ct. at 1594; *Doganiere v. United States*, 914 F.2d 165, 167 (9th Cir. 1990). Cantu has failed to allege facts which would support a finding of cause for his procedural default. Nor can he demonstrate that either error occurred, or if error occurred, that it worked to his actual and substantial disadvantage at trial. *See Frady*, 456 U.S. at 170, 102 S.Ct. at 1596 (defendant must show more than a possibility of prejudice, but that error worked to his actual and substantial disadvantage).

The Court of Appeals for the Fifth Circuit follows a two-prong test in determining the admissibility of identification testimony following a pretrial photographic identification. First, it determines whether the pretrial procedure was impermissibly suggestive; then it determines whether, based on the totality of the circumstances, the procedure posed a very substantial likelihood of irreparable misidentification. *United States v. Honer*, 225 F.3d 549, 552-53 (5th Cir. 2000); *United States v. Shaw*, 894 F.2d 689, 692 (5th Cir. 1990).

36

Cantu's allegations are insufficient to support a finding that the pretrial identification was impermissibly suggestive. This inquiry turns on the degree of the suggestiveness and the reason for failure to resort to less suggestive procedures. *See United States v. Stevens*, 935 F.2d 1380, 1389 (3rd Cir. 1991). The fact that two photographs of Cantu were included does not automatically render the pretrial procedure impermissibly suggestive. *See id.* (citing *Heiman v. State*, 511 N.E.2d 458, 459-60 (Ind.1987)). Here, the record reflects that although two photographs of Cantu, numbers 2 and 5, were included in the five photographs mailed to Miller, Sergeant Brazzil testified that each of the photographs were copies of blown up drivers' licenses photographs made by him with a photocopier; the clarity of all of the pictures was poor and the two photographs of Cantu were dissimilar (Doc.136, p. 771, 778, 781,795-96; G.E.119-A). This court commented on the quality of the pictures when they were identified, asking Sergeant Brazzil if he could not get better pictures; and the sergeant answered that he could not at that time (Doc.136,p.778). The letter that accompanied the photographs simply asked Miller to see if he could identify <u>anyone</u> in the marihuana distribution organization that he had seen in Houston (Doc.136,p.779). Given the poor quality of the photographs, the dissimilarity between the two photographs of Cantu and the fact that the witness was

not told that the law enforcement officer was looking for any particular individual, the procedure was not unnecessarily suggestive.

Assuming *arguendo*, however, that it was unnecessarily or impermissibly suggestive, "[a] pretrial identification found to be reliable will be admitted despite an impermissibly suggestive photographic array." *United States v. Merkt*, 794 F.2d 950, 958 (5th Cir. 1986). The reliability of the pretrial identification turns on (1) the opportunity of the witness to view the suspect, (2) the witness' degree of attention, (3) the accuracy of the pre-identification description, (4) the witness' level of certainty, (5) the time that has elapsed between the crime and the identification, and (6) the corrupting influence of the suggestive identification itself. *Merkt*, 794 F.2d at 958; *Honer*, 225 F.3d at 553-54. The fact that some, or even a majority of these factors weigh against the reliability of the identification is not conclusive. *Merkt*, 794 F.2d at 958. The issue is whether, under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification. *Id.*; *Honer*, 225 F.3d at 553. Since the issue before this court in this collateral proceeding is whether Cantu can demonstrate substantial and actual prejudice, this court must go further and consider the entirety of the evidence before the jury and the court's instructions to determine whether Cantu can demonstrate the requisite degree of prejudice.

Miller testified that he first was introduced to Cantu at Cantu's Manitou's house by Cantu as Fabian (Doc.135,pp.687-88,749). When asked if he was certain of his identification of Cantu as the person introduced as Fabian, he answered in the affirmative (Doc.135,p.690). Miller also stated that every time he visited the Malibu location Cantu was there, so he believed Cantu lived at that location (Doc.135,p.751). The trip during which Cantu identified himself as Fabian was Miller's eleventh trip (Doc.135,p.689, see also pp.8,10-11, *supra*). That meeting with Cantu at the Manitou house was in March 1995, and lasted long enough for Miller to observe Cantu count the $11,000 that Jerry Lamar brought to purchase the marihuana (Doc.135,pp.687-90). During the next meeting at the Manitou house, which took place in April 1995, Cantu introduced Miller to someone Cantu identified as his brother and Little Roy (Doc.135,p.691). During that meeting, Cantu asked Miller if would be willing to take a delivery to Wisconsin as well as to Terry in Arkansas (Doc.135,pp.691-92). Miller therefore had a good opportunity to view Cantu prior to the identification of Cantu from the photographs.

Miller testified that Sergeant Brazzil sent him the photographs during the summer of 1995, in late June or July (Doc.135,p.717). The identification was therefore close in time to Miller's visits with Cantu in March and April of 1995. The photographs that depicted Cantu were numbers 2 and 5 (7 R. 779). When Miller

responded in writing to Sergeant Brazzil's inquiry, he said photograph 2 was the person he thought was Fabian Cantu (Doc.167,Tab7). He said he was "positive" this person ran operations at the house and that he believed him to be Javier's brother because he would say he had to call Javier to find out the amount to be sent with Miller (Doc.167,Tab7 ). He said he would also call someone and tell them what to bring for Miller (Doc.167,Tab7). He said the first time he saw him was early the previous summer and that he was there at the house almost every trip (Doc.167,Tab7). Miller said when Cavazos was there, Cavazos would receive orders from the person in photograph 2 and that the person in photograph 2 never actually touched any load (Doc.167,Tab 7). Miller also stated in the letter to Sergeant Brazzil that photograph 5 was either an older photograph of the same person, or a brother who looked just like him (Doc.167,Tab 7). At trial, Miller testified that the person in photograph 2 was Cantu (Doc.135,pp.705-06).

The record also reflects that Cantu's attorney conducted extensive cross-examination of both Sergeant Brazzil and Miller regarding Miller's out-of-court identification of Cantu and of Cantu's identification of himself as Fabian; and, that the photographs and Miller's letter to Sergeant Brazzil were introduced into evidence (Doc.135,pp.712-49, 753-54; Doc.136,pp.788-801; G.E.119,119A). In addition, the record reflects that this court instructed the jury not to consider identification

evidence unless the jury found it true beyond a reasonable doubt; and, gave them

guidance on factors to consider in evaluating such evidence, including the manner in

which the defendant was presented to the witness for identification:

> In any criminal case the Government must prove not only the essential elements of the offense or offense as charged, as hereinafter defined, but must also prove, of course, the identity of the defendant as the perpetrator of the alleged offense or offenses.

> In evaluating the identification testimony of a witness, you should consider all the factors already mentioned concerning your assessment of the credibility of any witness in general, and should also consider, in particular, whether the witness had an adequate opportunity to observe the person in question at the time or times about which the witness testified.

> You may consider in that regard such matters as the length of time the witness had to observe the person in question, the prevailing conditions at that time in terms of visibility or distance and the like, and whether the witness had known or observed the person at earlier times.

> You may also consider the circumstances surrounding the identification, itself, including, for example, the manner in which the defendant was presented to the witness for identification and the length of time that elapsed between the incident in question and the next opportunity the witness had to observe the defendant.

> If after examining all the testimony and evidence in the case you have a reasonable doubt as to the identity of the defendant as the perpetrator of the offense or offenses charged, you must find the defendant not guilty.

(Doc.137,pp. 1317-18).

41

Finally, the record reflects that Miller was not the only eyewitness to Cantu's participation in the conspiracy. Other eyewitness who described Cantu's involvement included Fabion Cavazos (Doc.133,pp.41-159); Graciela Cantu (Doc.115,pp.2-62); Alfonso Garcia Zaleta (Doc.134,pp.268-301); Antonio Sepulveda, Jr. (Doc.116,pp.2-66); and, Guadalupe Pena (Doc.135,pp.491-539). Given this record, there was no error in the introduction of Miller's identification of Cantu; however, if error occurred, it cannot be said that it worked to Cantu's actual and substantial disadvantage at trial. Cantu is therefore not entitled to relief in this collateral proceeding.

### The Alleged Brady Violation

Finally, Cantu contends that the United States violated *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194 (1963), by allegedly withholding evidence that he claims would have contradicted Fabian Cavazos' testimony at trial. According to Cantu, Cavazos testified that all of his marihuana trafficking activity was done while working for him. Cantu fails to identify for this court precisely where in the record Cavazos gave this testimony. The United States has reviewed Cavazos' testimony and has only found a statement by Cavazos in response to this court's request for clarification of Cavazos' testimony regarding the amount of drugs for which Cantu's organization was responsible.

42

The record reflects that the prosecutor asked Cavazos to estimate the amount of pounds of marihuana distributed by Cantu's organization (Doc.133,p.119). Cavazos said it was a lot and when asked to give a ball park estimate, said it was hard to do (Doc.133,p.119). This court then reminded Cavazos that he had earlier testified that when he started with Cantu in the 80's the loads were 10 or 12 pounds and asked how often that quantity was sold (Doc.133,pp.119-20). Cavazos answered once or twice a month for a couple of years and that then they were larger after 1988 (Doc.133,pp.119-20). Cavazos said the loads increased to 100 to 200 pounds once or twice per month for a year or two, then they increased to about 1000 pounds every month until his arrest in 1991 (Doc.133,pp.121-22). Cavazos said he went back into business with Cantu in 1993 and between that time and his arrest in 1995 the shipments were between 400 to 1000 pounds about twice per month (Doc.133,p.121-23). After clarifying that the amounts Cavazos' testified to were his best estimates based on personal knowledge, this court also clarified that Cavazos' was not working for some other organization:

> THE COURT: So you were involved with that much – and I am asking, I am not telling you, all right, sir – until you got arrested in 1995?
>
> THE WITNESS: Yes.
>
> THE COURT: And since '95 you don't know what has happened?

THE WITNESS: Right.

THE COURT: And that's what you have personal knowledge of?

THE WITNESS: Yes, sir.

THE COURT: And those would be your best estimates?

THE WITNESS: Yes, sir.

THE COURT: All right.

THE COURT: Now, how do you know – how did you know how much weights were involved? You told the jury anywhere from 400 to a thousand pounds. How did you know that?

THE WITNESS: Because I was the one that would go and weigh it and help wrap.

THE COURT: You weighed and helped wrap?

THE WITNESS: Yes.

THE COURT: Did you ever work for anybody else in the marijuana business other than the person you have so stated designated as your employer so to speak in that business?

THE WITNESS: No. Never.

THE COURT: At all times you worked for –

THE WITNESS: For Javier.

THE COURT: The defendant in this case?

THE WITNESS: Yes.

44

(Doc.133,pp.124-25).

In support of his claim of a *Brady* violation, counsel for Cantu makes the following unsworn statement:

> Counsel for Movant has since learned that in 1986 Cavazos was arrested in Refugio, Texas, with a large amount of marijuana, along with another government witness, Richard Russell. At the time of Mr. Cavazos' arrest, he was driving a pickup, mustard in color, with Arkansas license plates. <u>The significance of the arrest was that Mr. Cavazos was employed by another narcotics trafficker at the time</u>, which would have contradicted his trial testimony.

(Doc.167,p.7) (emphasis added).

As a preliminary matter, since Cantu did not raise this issue at trial or on direct appeal he must demonstrate cause and prejudice. *See Frady*, 456 U.S. at 167-68, 102 S.Ct. at 1594. Second, the United States is unaware of a witness at Cantu's trial named Richard Russell (See Doc.133,pp.3-12(Index to Witnesses)). There was, however, evidence at trial that in January of 1986, Cantu attempted to send marihuana out of the Rio Grande Valley area from the Harlingen airport with Roy Cantu and with his cousin, Ricky Russell (Doc.133,pp.136-137,196-200). Third, Cantu has failed to point to <u>evidence</u> in existence that would demonstrate that Cavazos was employed by another narcotics trafficker in 1986, other than his attorney's conclusory statement. To be entitled to a hearing, a motion under § 2255 must contain assertions of fact that a petitioner is in a position to establish by competent evidence. *Barrett v.*

45

*United States*, 965 F.2d 1184, 1195 (1st Cir. 1992). Conclusory allegations are insufficient to raise a constitutional issue. *See United States v. Pineda*, 988 F.2d 22, 23 (5th Cir. 1993). Assuming *arguendo*, that Cantu could demonstrate that Cavazos was arrested with a large amount of marihuana in Refugio, Texas, along with another person in 1986, that would not establish his employment by another person. *See Ward v. Whitley*, 21 F.3d 1355, 1360 (5th Cir. 1980) (no *Brady* violation where defendant made no showing documents he claimed were missing contained *Brady* material).

There are three components to a due process violation under *Brady*: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching, that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, ___, 119 S.Ct. 1936, 1948 (1999). "[T]here is never a real `*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at ___, 119 S.Ct. at 1948.

To demonstrate the degree of prejudice necessary to establish a due process violation, the defendant

> ... must establish that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.... [A] reasonable probability is shown where

46

the nondisclosure `could reasonably be taken to put the whole case in such a different light as to undermine confidence in the jury verdict.'"

*United States v. Webster*, 162 F.3d 308, 336 (5th Cir. 1998). (citations omitted). "`The question is not whether the defendant would more likely than not have received a different verdict with the [concealed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *United States v. Noriega*, 117 F.3d 1206, 1219 (11th Cir. 1997) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566 (1995)). Further, since Cantu makes this claim for the first time in this § 2255 proceeding, he must demonstrate any error worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions. *Preston v. Delo*, 100 F.3d 596, 600 (8th Cir. 1996); *Frady*, 456 U.S. at 170, 102 S.Ct. at 1596.

Cantu's allegations, even if he could demonstrate them to be true, are insufficient to meet this burden.  As discussed above at pp. 43-44, *supra*, the statement of the witness was elicited by the court, and not the prosecutor; and when viewed in context, it is apparent that the court's question was designed to clarify that when Cavazos estimated the amount of marihuana moved by Cantu he was not holding Cantu accountable for marihuana Cavazos might have transported on behalf of some other drug trafficker.  Further, if Cavazos' statement could be viewed as an

assertion that he never worked for any other drug trafficker while employed by Cantu,

proof that he worked for someone else in 1986 would not have exculpated Cantu and

would have merely amounted to impeachment on a collateral matter.  To establish a

*Brady* violation, it is not enough to demonstrate that impeachment evidence existed

that was collateral. *United states v. Dumas*, 207 F.3d 11, 15 (1st Cir. 2000).  Even if

undisclosed evidence would prove witness's statement on cross-examination false,

no *Brady* violation occurs where the witness's statement was neither relevant nor

material to the issues at the defendant's trial. *United States v. Payne*, 102 F.3d 289,

293 (7th Cir. 1997).  Assuming *arguendo*, that the witness falsely stated that he was

solely employed by Cantu in the marihuana business in 1986, that fact was not

material to any issue in this case.  When Cavazos worked for Cantu in 1986, the

shipments were only 10 to 12 pounds.  It was later, around 1988, that the loads

become significantly larger. *See* p. 43, *supra*.  Because Cantu has failed to plead facts

which, if true, would demonstrate that, if error occurred, it worked to his actual and

substantial disadvantage at trial, he is not entitled to relief.

## CONCLUSION

Based on the foregoing, Cantu's motion under §2255 should be denied.

Respectfully submitted,

MERVYN M. MOSBACKER
United States Attorney

_____

KATHLYN G. SNYDER
Assistant United States Attorney
910 Travis, Suite 1500
P.O. Box 61129
Houston, Texas 77208-1129
(713) 567-9368
TBA No. 07839300

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I, Kathlyn G. Snyder, Assistant United States Attorney, certify that a copy of

the above  Answer to Motion under § 2255 and Brief has been mailed on February

2, 2001, to:

      Chris Flood
      914 Preston Avenue, Suite 800
      Houston, Texas 77002

                                    _____
                                    KATHLYN G. SNYDER
                                    Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| JAVIER LOPEZ CANTU, | § | |
|     Petitioner, | § | |
| | § | CIVIL ACTION NO. B-00-154 |
|     v. | § | CRIMINAL NO. B-97-020 |
| UNITED STATES OF AMERICA, | § | |
|     Respondent. | § | |

## ORDER

Pending before this court is Petitioner's Motion for Relief under Section 2255.

After having considered same, along with the response of the United States, this court

is of the view that relief should be denied for the reasons set out in the United States'

answer and supplemental answer.

Signed at Brownsville, Texas this _____ day of \_\_\_\_ 2001.


_____
JOHN WILLIAM BLACK
UNITED STATES MAGISTRATE JUDGE